# JANUARY TERM, 1892.

|  |  |
|---|---|
| 36 | 1 |
| 36 | 138 |

|  |  |
|---|---|
| 36 | 1 |
| f64 | 145 |

|  |  |
|---|---|
| 36 | 1 |
| 66 | 263 |

## CHARLESTON.

LEWIS *et ux* v. BROUN *et al.*

Submitted January 29, 1891.   Decided January 19, 1892.

1. ATTORNEY AT LAW—CHAMPERTY.

A person having, or honestly believing he has, an interest in the subject of litigation in a suit may lawfully assist in payment of costs and expenses in the defence or maintenance of such suit.

2. ATTORNEY AT LAW—CONTINGENT FEE.

A contract to pay counsel for his services an amount contingent entirely upon success is not, for that reason, illegal.

3. ATTORNEY AT LAW—ASSIGNMENT OF CAUSE OF ACTION.

An attorney at law, while holding that relation, can not, as a

general rule, make a valid purchase of the subject-matter of litigation of his client, and the same is voidable at the option of the client.

4. ATTORNEY AT LAW—LIMITATIONS OF ACTIONS.
   But the suit to avoid such sale must be brought within a reasonable time.

5. ATTORNEY AT LAW—ASSIGNMENT OF CAUSE OF ACTION.
   And such sale can not be avoided after it has been deliberately ratified or confirmed on full information.

6. ATTORNEY AT LAW—ASSIGNMENT OF CAUSE OF ACTION—NOTICE.
   Nor can it be set aside as against subsequent purchasers for value without notice.

*T. B. Swann, J. S. Swann* and *O. Johnson* for appellants, cited 27 W. Va. 385; Id. 677 ; 29 Johns. 390 ; 5 Am. Rep. 586; 82 Va. 809; 14 Johns. 407; 4 Cow. 748; Id. 717, 718; 3 Eng. & Am. Ency. L. 76; 21 Ind. 306; 4 Caldw. 581; Id. 431 ; 23 Ill. 279; 7 Yerg. 30; 16 W. Va. 32; 21 W. Va. 617; 31 Barb. 533 ; 8 R. I. 389; 15 Cal. 388; 4 Pet. 187; 3 How. (U. S.) 333 ; 25 Pa. St. 354; 34 Gratt. 478 ; 27 Gratt. 401 ; 24 W. Va. 679; 5 W. Va. 752 ; Sto. Eq. §§ 604, 805 ; Id. 311–315 ; 2 Ves. 200, 202, 203 ; 18 Ves. Jr. 120, 124 ; 1 Jac. & Walk. 441 ; 2 Atk. 295 ; 5 Pr. Ex. Rep. 58 ; 5 Paige 561; Id. 311; Hill Trusts 265 (s. p.) ; 23 W. Va. 724 ; Id. 127 ; 20 How. (U. S.) 132 ; 20 Gratt. 109–111; 17 Barb. 397; 18 Am. Dec. 389 ; 25 Am. Dec. 71; 4 How. (U. S.) 561 ; Id. 506 ; 9 Pick. 202; 19 Conn. 431 ; 16 W. Va. 553–555 ; 6 Ves. Jr. 266 ; 4 Edw. Ch'y 40, 45, 46; 40 Barb. 521 ; 31 Am. Rep. 23 ; 59 Ala. 58; 86 Pa. St. 512; 8 Ala. 669 ; 1 Pick. 415; 7 Mich. 545; 27 Ill. 150 ; 23 Gratt. 73 ; 13 Pick. 276; 15 N. C. Eq. 73 ; 6 T. B. Mon. 372 ; 4 Mich. 533 ; 17 Ala. 385.

*E. B. Knight, W. Mollohan* and *T. L. Broun* for appellee, cited 76 Am. Dec. 328 ; 36 Ala. 504; 5 Dana 520 ; 3 Am. & Eng. Ency. Law 76, 77; 2 Sto. Eq. Juris. §§ 1048, 1049 ; 27 W. Va. 386, 396 ; 10 W. Va. 365 ; 16 W. Va. 33.

HOLT, JUDGE :

John Lewis, theretofore living in Kanawha county and owning certain lands therein, removed to the State of Florida, where he died in the year 1854, leaving four children,

Andrew D. Lewis, John V. Lewis, James V. Lewis, and Margery J. Kenna, afterwards by second marriage Margery J. Ashby. In 1888, E. M. Fowler *et al* brought suit in the Circuit Court of Kanawha county against John Lewis's administrator and heirs, claiming to be half owners of certain land *prima facie* owned by John Lewis alone. In March, 1861, James L. Carr brought his suit against John Slack, administrator, *c. t. a.*, and the heirs of John Lewis, to enforce payment of a claim against John Lewis's estate, which was afterwards made a creditors' bill by order of reference.

Out of these suits or connected therewith various other suits by petition and by bill for injunction grew up. During the pendency of these suits James V. Lewis, who lived in Missouri, by contract of January 10, 1871, agreed to give his attorney, Thomas L. Broun, a contingent fee of one third of what might be realized for him out of his father's Kanawha property, and on 27th of September, 1882, James V. Lewis for one thousand dollars made a quitclaim sale of his interest to his attorney, Thomas L. Broun; and by deed of March 6, 1883, James V. Lewis and wife conveyed and assigned his interest in the "Bull Creek land" and certain personal property to T. L Broun. On the 17th of April, 1889, James V. Lewis filed this petition in the causes mentioned, which was treated as an original bill, against Thomas L. Broun and others, alleging that the contract of January 10, 1871, for the contingent fee was champertous and illegal, and the sale and conveyance of March 6, 1883, was fraudulent and voidable, and praying that they be so declared and set aside. On the 8th of April, 1890, the cause of E. M. Fowler *et al* against the administrator and heirs of John Lewis, deceased, came on to be further heard on this petition in the nature of an original bill and other papers; and the Circuit Court pronounced a decree dismissing the petitions of James V. Lewis and wife with costs. From this decree James V. Lewis and wife have brought here their cause on appeal.

The first question presented is: Was the contract of James V. Lewis of January 10, 1871, with Thomas L. Broun for a contingent fee champertous? The facts bearing on this

branch of the case are as follows: John Lewis, the ances-
tor of James V. Lewis, died in 1854 largely indebted in
the county of Kanawha, and seised of a tract of land of six
thousand and six acres in Boone county on Big Coal river
and waters, called and known as the "Bull Creek Land,"
having also a claim of some four thousand dollars, against the
Donnally estate, involved in the chancery cause then pend-
ing of *Ruffner's Heirs* v. *Donnally's Heirs.* In 1858, E. M. Fow-
ler and others brought their suit against John Lewis's heirs
and administrator, claiming a large debt against the estate
of John Lewis, which claim was afterwards fixed by
compromise at seven thousand five hundred dollars with
interest from June 1, 1866. James L. Carr had obtained a
judgment at law against John Lewis, administrator, and in
1861 brought a chancery suit to enforce the collection of
his debt by sale of the Bull Creek land.

In 1865 Carr's suit was converted into a creditors' suit,
in which the creditors were convened, and under which the
creditors of James V. Lewis and other heirs were also con-
vened or attempted to be convened. Out of these grew
other suits, all involving long, protracted, and complicated
litigation. In this litigation Thomas L. Broun was the
counsel of the widow, Sarah E. Lewis, and of James V.
Lewis; also in all other litigation respecting their interests
from 1858 to 1889. The land known as the "Bull Creek
Tract" proper embraced all the lands drained by the creek
of that name, and contained five thousand two hundred and
eighty six acres.

In 1865 T. L. Broun was employed by the heirs of John
Lewis to ascertain the true quantity, location, title *etc.*, with
the view of finding a purchaser at private sale, at such
price, if possible, as would pay off all the claims against it
as the land of John Lewis, and all the liens and claims
against the residue as belonging to the respective heirs.
This, as the evidence shows, involved the examination of
records in the counties of Kanawha and Boone, surveying
maps, abstracts of title, *etc.*, which was done at T. L.
Broun's own cost and expense, and resulted in adding seven
hundred and twenty acres, increasing the quantity to six
thousand and six acres. T. L. Broun then had coal mines

opened, procured specimens, had maps and abstracts made, took them to New York, and effected what is called the "Bininger Sale" for fifty two thousand dollars, which proved abortive.

In the meantime there was a decree to sell, and Nicholas Fitzhugh, as commissioner, had the land advertised for sale. This sale, T. L. Broun, on behalf of James V. Lewis and other heirs, had enjoined; the highest bid offered being twelve thousand dollars, not enough by some four thousand dollars to pay the claims against the ancestor John Lewis. Mr. Ashby, one of the heirs and the administrator of the widow, Sarah E. Lewis, had already agreed to give him, T. L. Broun, for his services a contingent interest of one fourth of their interest in whatever he could make the land bring over and above all liens and claims. James V. Lewis had never paid any fee or any part of the costs and expenses of any kind.

On December 11, 1870, T. L. Broun wrote to James V. Lewis, giving him a full statement of how the matter stood, and proposed to advance for him his portion of the costs, provided James V. Lewis would give him one third of whatever he might recover for him out of the sale of the property, telling him that prompt action and vigorous prosecution of his interest was necessary, but that he felt confident that in six months a better price could be obtained. Then T. L. Broun added: "If you prefer not to pay a contingent fee, send me one hundred dollars to pay your part of the present costs and fees, and I will do the best I can for you. Bininger, the former purchaser, is insolvent, and the creditors are demanding a sale of the lands. I will work in the suit for your interests on either of these plans mentioned in this letter, but wish you at once to make choice." To this James V. Lewis replied by letter of December 19, 1870, saying that he would give one third of his interest in the Bull Creek land, Broun to pay his third of the costs, and also for selling the land for him. Accordingly the contract of January 10, 1871, was entered into between James V. Lewis and Thomas L. Broun, by which Lewis "agreed to give, and did give," to Broun one third of his share in the Donnally claim of the John W. Lewis

claim, and of proceeds of sale of Bull Creek land; and in consideration Broun agreed to give his services in the suit involving these interests, and to advance and pay for the said James V. Lewis all costs accruing against Lewis from the date of the contract; which was to be also compensation for all charges in selling the land.

Blackstone defines "champerty" as a species of maintenance, "being a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champetor is to carry on the party's suit at his own expense." 4 Bl. Comm. 135. Prior to this contract T. L. Broun had acquired from Mrs. Ashby and from the administrator of Sarah E. Lewis, deceased, an interest in the Bull Creek land and in the estate involved in this litigation; so that at the time of this contract James V. Lewis and T. L. Broun had a common interest in the subject-matter of litigation.

"The doctrine of the common-law as to champerty and maintenance is to be understood with proper limitations and qualifications, and can not be applied to a person having an interest, or believing that he has an interest, in the subject in dispute, and *bona fide* acting in the suit; for he may lawfully assist in the defence or maintenance of that suit." Story, Eq. Jur. § 1048, and notes.

The statute of 33 Edw. I. against champerty was in substance enacted by the legislature of Virginia in 1792. See Code of 1819, vol. 1, p. 558, c. 144. But this was omitted in the revisal of 1849, and has never been re-enacted. Our present law on the subject of attorneys is as follows: "An attorney shall be entitled for his services as such to such sum as he may contract for with the party for whom the service is rendered; and, in the absence of such contract, he may recover of such party what his services were reasonably worth." Code (1891) c. 119, s. 13.

The case of *Major's Ex'r* v. *Gibson*, 1 Pat. & H. 48, grew out of a contract made in 1848, while the law against champerty in the Code of 1819 was still in force. It was decided by the special Court of Appeals of Virginia in 1855, and is cited in the margin of our present Code. Though not a binding authority, yet, owing to the full discussion of the

subject of champerty and contingent fees by counsel of great eminence in their day, it has been from that time to this our leading case on the general doctrine.

The legality of a contingent fee is recognized in *Polsley* v. *Anderson*, 7 W. Va. 202.

In *Graham* v. *Graham*, 10 W. Va. 355–384, in which it is said that the doctrine laid down by 4 Bl. Comm. p. 135, on the subject of champtery has been very much modified by statute in our State, it was held that the contract in that case to pay costs and carry on the suit about the subject-matter purchased did not, with us, amount to champerty or maintenance. In *Anderson* v. *Caraway*, 27 W. Va. 385, the same doctrine is laid down.

In this case T. L. Broun already had an interest in the property, and a common interest and duty with James V. Lewis in paying costs and expenses. From the testimony it clearly appears that Thomas L. Broun, during the period of more than twenty years, had used more than ordinary watchfulness, diligence and care in preserving this property and in securing a sale at the best price possible, advance-ing his own money when necessary, and devoting to it a great deal of time and labor, and that what James V. Lewis gave him was not more than what his services were reason-ably worth. This appears from the concurrent testimony of many witnesses, who speak from their own knowledge of the facts.

The second and remaining question is: Was the con-tract of September 27, 1882, by which James V. Lewis, in consideration of one thousand dollars sold without any re-course to Thomas L. Broun, his attorney at law, co-owner and agent to sell his interest in this property then in litiga-tion, voidable at the option of Lewis in 1889? Our doc-trine on this general subject is to be found in the cases of *Carter* v. *Harris*, 4 Rand. (Va.) 204; *Moore* v. *Hilton*, 12 Leigh, 28; *Buckles* v. *Lafferty*, 2 Rob. (Va.) 292; *Bailey* v. *Robinson*, 1 Gratt. 9; *Newcomb* v. *Brooks*, 16 W. Va. 32; *Lane* v. *Black*, 21 W. Va. 617; *Anderson* v. *Fox*, 2 Hen. & M. 245; *McKey* v. *Young*, 4 Hen. & M. 430. See, also, *Burnham* v. *Haselton*, 82 Me. 495 (20 Atl. Rep. 80.)

A purchase of trust-property, made by one who holds

a fiduciary or confidential relation, is voidable at the option of the *cestui que trust* who makes the sale, although the fiduciary may have given an adequate price and gained no advantage whatever. It is generally discussed under the head of fraud but rests in its broadest extent upon the temptation to fraud and undue influence and the difficulty of ascertaining it. Therefore, without imputing fraud in fact, a principle of public policy requires all such contracts to be treated as *prima facie* invalid and voidable at the option of the seller or *cestui que trust*. But he must sue or proceed to disaffirm within a reasonable time, although the trust-property still remains in the hands of the fiduciary. If the property has passed into the hands of a subsequent purchaser for value without notice, the sale can no longer be set aside. In that case his remedy is only against the fiduciary.

Mr. Bigelow in his recent work on Fraud, under the head of "Constructive Fraud—Fiduciary and Confidential Relations," discusses the subject with full reference to authorities. He deals with it under various separate heads, including, among others, the three here involved, viz: "Attorney and Client," "Principal and Agent," "Partners and Joint Purchasers." 1 Bigelow, Frauds, 261.

Much has been said about the "Donnally claim or assignment." This was a debt of some four thousand dollars, belonging to the estate of the ancestor, John Lewis, deceased, which, after long litigation in the chancery cause of *Ruffner* v. *Donnally*, was finally realized and paid over to the creditors of John Lewis, amounting, when paid, to about twelve thousand dollars, and reducing the unpaid claims to about five thousand dollars. As to this claim, T. L. Broun, by letter of November 26, 1871, to James V. Lewis, received by him, says: "The Donnally debt I will make, but the creditors will get the money. No sale yet of Bull Creek. The creditors are trying to force a sale of the land. So far I have prevented it, as a sale by decree of the court will make the lands sell for very little. I have placed this land in the hands of agents in New York and elsewhere, and hope this coming winter and spring to find a purchaser."

What is called the "Ashby claim" of six hundred dollars was only payable out of Mrs. Ashby's one fourth of surplus of proceeds of sale of Bull Creek land, after paying debts against the estate of John Lewis, her father; so that whether Broun would realize anything or not all depended upon what could be made out of the Bull Creek land. Coal River lands, of like character as to timber and coal, were then selling, and have since sold, for from one dollar and fifty cents to three dollars per acre ; so that it was a contract of hazard.

The evidence clearly shows that T. L. Broun was vigilant and active in the matter, and kept James V. Lewis fully advised as to the true state of the litigation of the property and the prospects of sale. There is no important fact in this regard which did not come to his knowledge by letters received from Broun ; so that it can not be doubted that Broun acted in the matter with the utmost good faith, keeping nothing back willfully or negligently.

But James V. Lewis, either because he needed money badly, or because he was fearful that there would be nothing coming to him after the payment of the claims against his father's estate, determined to sell, and importuned Broun by letter repeatedly through a period of some eleven years to buy. Broun was not able himself to buy without inconvenience, but made repeated and long continued efforts to sell. But it required a sale of the Bull Creek land at some three dollars per acre to pay the debts of the ancestor, and Coal River lands were not selling at any higher price. Finally, by contract of September 25, 1882, the sale was made by Lewis to Broun of his interest, which was consummated by deed of March 6, 1883.

If at this stage, or within a reasonable time thereafter, James V. Lewis had asked this contract to be set aside, under our decisions his request would have been granted. But this he did not do. He retained the one thousand dollars paid him by Broun, and on various occasions during a period of six years, with full information of all important facts, deliberately ratified and confirmed his sale; and, among other modes, by a paper of July 15, 1886, duly executed and acknowledged for record as the law requires,

whereby he released and acknowledged satisfaction of his vendor's lien retained in his deed of March, 1883.

On February 20, 1883, Thomas L. Broun and wife conveyed this James V. Lewis interest in the Bull Creek land to S. A. Miller, trustee, to secure to Mary A. Buster the payment of one thousand two hundred dollars. By deed of July 14, 1886, T. L. Broun and wife, to secure to Jacob Humbird the payment of two thousand dollars borrowed money, conveyed all his interest in the Bull Creek land to Humbird. Again, by deed of February 19, 1889, T. L. Broun conveyed to Peter Fontaine, trustee, all his interest in the proceeds of the sale of the Bull Creek land, to secure the payment of various debts, amounting to between five and six thousand dollars. These mortgagees and trust-creditors are, under our decisions, regarded as purchasers, and there is nothing to show that they had any notice of any defect in this voidable contract, or, if so, they knew, no doubt, of its confirmation by release of vendor's lien, which was recorded also in Boone county, where the land lies.

Not until after the lapse of six years, and a fortunate sale had been made of the Bull Creek land, which will yield very considerably more than the one thousand dollars for which he had sold, does James V. Lewis make any complaint or ask to rescind. He comes too late. He has ratified this sale deliberately, and on full information. He has suffered six years to pass without complaint; new rights have intervened; the old rights have been confirmed; so that now to rescind this contract at plaintiff's instance would be to permit him to pervert a wise rule of public policy into an instrument of fraud. The decree complained of is therefore affirmed.

Affirmed.