ALBERT J. BOYLE *v.* GEO. M. BELTZHOOVER, JR., *et al.*

(No. 8632)

Submitted January 18, 1938. Decided February 22, 1938.

*J. M. Mason, Jr.,* and *Harry H. Byrer,* for appellant.
*George Poffenbarger, George M. Beltzhoover, Jr.,* and
*Terence D. Stewart* for appellees.

Fox, Judge:

Albert J. Boyle complains of a decree of the circuit
court of Jefferson County in his suit against George M.
Beltzhoover, Jr., and others, to set aside a contract dated
November 20, 1934, by which Boyle transferred to Beltz-
hoover certain preferred and common stock of the
Charles Town Jockey Club, Incorporated. The Jockey
Club is made a defendant because its stock is involved
in this suit, and action on its part may be required by
the court to carry out its final decree with respect
thereto. The real controversy is between Boyle and
Beltzhoover.

Some time in the year 1933 the Shenandoah Valley
Jockey Club was organized for the purpose of establish-
ing a race track plant near Charles Town in Jefferson
County, and it acquired two tracts of land on which its
track was to be located, one from the Charles Town
Horse Show Association and the other from Corrine R.
Mason. Title to the horse show tract was conveyed by
deed, and there was an executory contract executed by
Corrine R. Mason for the other tract. The consider-
ation for the land so acquired was largely unpaid, and,
at the date of the transaction involved herein, the total
purchase money due for these properties was approxi-
mately $15,000.00, about equally divided between the
two former owners. Immediately after the acquisition

of these lands, a race track was graded, and stables and other buildings erected on said land, involving expenditures of large sums of money, and race meets were held in December, 1933 and May, 1934. The enterprise was not successful, and in 1934, creditors of the Club instituted suits to enforce liens of various characters against its property with the result that all said property was decreed to sale.

Albert J. Boyle, the plaintiff herein, was a stockholder in the Eastern Engineers, a Maryland corporation, which had the contract for the construction of the race track, buildings, etc. of the Jockey Club, and was the construction engineer in said work. He had considerable money invested in said corporation and had suffered the loss of his entire investment therein, the Eastern Engineers having been forced into receivership. Upon the downfall of the Jockey Club enterprise, Boyle conceived the idea of a reorganization of the race track proposition, and, in connection therewith, employed as his attorney one James M. Mason, Jr. It appears that the defendant, George M. Beltzhoover, Jr. was counsel for Corrine R. Mason, and other creditors of the Shenandoah Valley Jockey Club. A question existed as to whether or not the proposed new organization could secure title to the Corrine R. Mason tract. This was an extremely important matter because a part of the race track was located on this tract as well as some of the stables and other buildings, and its loss would have been fatal to the plan upon which Boyle was working. About the first of August, 1934, Boyle employed Beltzhoover as his attorney. The particular purpose of this employment is not entirely clear, but, considering the situation as a whole, it is not unreasonable to assume that the purpose was to enlist his support and advice in the plan of Boyle to reorganize the race track enterprise to satisfy the creditors of the Shenandoah Valley Jockey Club, and place a new organization in such position as would enable it to hold race track meets in Charles Town. Negotiations were had between Boyle and his counsel, and with creditors of the Shenandoah Valley Jockey Club and their attorneys, and two or more papers were prepared containing propo-

sitions under which a reorganization might be effected. The final result of these negotiations was that a contract, dated October 15, 1934, between Boyle on the one part, and the creditors of the Shenandoah Valley Jockey Club on the other, was agreed upon and actually signed about the 7th of November, 1934, by which it was agreed that Boyle, the Charles Town Horse Show Association and Corrine R. Mason were to organize a corporation to be known as the Charles Town Jockey Club, and purchase the real estate of the Shenandoah Valley Jockey Club then about to be sold at a judicial sale. A deed of trust was executed by the Charles Town Jockey Club on all of its property, including the Mason tract, to secure the payment of three classes of bonds, A, B, and C, respectively. Class "A" bonds were to be delivered to the Charles Town Horse Show Association and to Corrine R. Mason, covering the purchase money due them for the real estate on which the race track was located; class "B" bonds were to be issued in a sum not to exceed $20,000.00 as working capital; and class "C" bonds were to cover existing liens against the property other than the lien of the Eastern Engineers. At the time this agreement was entered into, it was understood that title to the Corrine R. Mason tract would be acquired through the purchase of the Shenandoah Valley Jockey Club property, but it was agreed that if such title did not pass under such purchase, Corrine R. Mason was to convey said tract to four trustees who, upon the delivery of the class "A" bonds above mentioned in an amount sufficient to cover the purchase money due Corrine R. Mason, would transfer the same to the new corporation. On the 7th of November, 1934, Boyle purchased the property of the Shenandoah Valley Jockey Club for the Charles Town Jockey Club, and immediately thereafter, a meeting of its stockholders was held and said purchase ratified, and it was agreed, as appeared from the minutes of that meeting, that in consideration of Boyle's transfer of his purchase, he was to receive the entire stock of the corporation other than qualifying shares issued to other stockholders.

It appears that plans had been made for a race meet

to be held early in December, 1934, and in order to carry on said meet, it was necessary to secure a permit therefor from the State Racing Commissioner. It likewise appears that an understanding existed between Boyle and Beltzhoover by which they together were to make a trip to the state capitol in an effort to secure this permit. On the 20th of November, 1934, the contract out of which this litigation grows was executed between Boyle and Beltzhoover, and is in the words and figures following:

"THIS CONTRACT made this 20th day of November, 1934, between Albert J. Boyle and George M. Beltzhoover, Jr.,

WITNESSETH, That for and in consideration of the personal services faithfully rendered the said Boyle by the said Beltzhoover, Jr., as his attorney, the receipt whereof is hereby acknowledged, as follows:

(a) In having a Receiver appointed for the Shenandoah Valley Jockey Club, a corporation, and in effecting a liquidation and sale of its assets by the Circuit Court of Jefferson County, West Virginia;

(b) In formulating and procuring the execution of the written contract, dated October 15, 1934, between the Charles Town Horse Show Association, Corrine R. Mason, Albert J. Boyle and the Mechanics' Lien creditors of the Shenandoah Valley Jockey Club and/or the Engineers, a corporation, to which reference is hereby made;

(c) In having the title to the 39.47 acres of land owned by Corrine R. Mason, adjoining the land of the Charles Town Horse Show Association, conveyed to the Charles Town Jockey Club, a corporation.

It is agreed between the said Albert J. Boyle and Geo. M. Beltzhoover, Jr., as follows:

1st. The said Boyle agrees to pay the said Beltzhoover the sum of One Thousand Dollars on or before the 17th day of December, 1934, out of the receipts of the Race meet to be held by the Charles Town Jockey Club to be held in December, 1934.

2nd. The said Boyle agrees to have the said Beltzhoover appointed Attorney for the Charles Town Jockey Club, for a period of five years,

commencing November 7th, 1934, or so long as the said Boyle shall be connected with said corporation, the said Beltzhoover shall receive a salary of $500. a year, payable semi-annually.

3rd. The said Beltzhoover shall receive an equal share with said Boyle of the Preferred Stock of said corporation, and shall receive 4000 shares of Common Stock of said corporation—the same to be issued and delivered to said Beltzhoover at the same time that said Boyle receives his stock in said corporation.

4th. The said parties agree to continue to work together in said corporation for their mutual interest and protection.

Witness the following signatures and seals.

A. J. Boyle    (Seal)

Geo. M. Beltzhoover (Seal) "

After the execution of this contract, Boyle and Beltzhoover came to the state capitol and, after some delay, obtained the desired permit for the race meet and said meet was held. On January 17, 1935, upon the request of Beltzhoover, there was issued to him certificates for shares of the common and preferred stock in the Charles Town Jockey Club in accordance with the contract above quoted. The record is not entirely clear as to the success of the December race meet, but both Boyle and Beltzhoover seemed then to believe that a change in the law governing racing would have to be enacted by the legislature to create a situation under which the track could be successfully operated, and some time during the 1935 Regular Session of the Legislature, they came to Charleston and appeared before a committee of the legislature and finally succeeded in having enacted a change in the law under which a very successful race meet was held in the spring of 1935. At this appearance before the legislative committee, Beltzhoover, in the presence of Boyle and without any protest from him, made a statement that he was the owner of a substantial portion of the stock of the Charles Town Jockey Club. In July, 1935, in issuing a notice for a stockholders' meeting of the Jockey Club, Boyle accredited himself the ownership of

5996 shares of the common stock of the corporation which would exclude the shares which had theretofore been issued to Beltzhoover.

About July, 1935, Beltzhoover, acting as counsel for various creditors of the Shenandoah Valley Jockey Club, instituted a suit in equity in the circuit court of Jefferson County, and verified the bill filed therein, in which an attack was made upon Boyle's ownership of any of the stock of the Charles Town Jockey Club, claiming the same to be vested in the creditors of the Shenandoah Valley Jockey Club. In November, 1935, about three months after this action on the part of Beltzhoover, this suit was instituted. Upon the trial of the cause, plaintiff introduced his testimony and upon the conclusion thereof, Beltzhoover moved the court for a decree in his favor under Rule 10 of the Rules of Practice and Procedure for Trial Courts, 116 W. Va. II. The motion was sustained and the plaintiff's bill was dismissed. From this action of the court, the plaintiff appeals.

It is obvious that the defendant, Beltzhoover, in making his motion under Rule 10, in effect, admits the truth of the testimony introduced by the plaintiff, so far as applicable to the issue before the court, together with any reasonable inferences which may be drawn therefrom. The situation is closely analogous to an action at law where there has been a motion to exclude the evidence and direct a verdict.

Under these circumstances we do not attempt a final adjudication of the merits of the cause. Our decision necessarily rests upon the bill of the plaintiff and the evidence introduced in support thereof. The final decree upon a full development of the case may or may not call for a different conclusion.

The plaintiff's bill, which is voluminous, rests upon two main propositions: (1) That under the relation of client and attorney existing between the parties, Beltzhoover could not, on grounds of public policy, enter into a contract with Boyle with relation to the subject matter about which he had been employed as attorney; and (2) that there was actual duress on the part of Beltz-

hoover as against Boyle, bringing about the execution of the contract sought to be cancelled.

A consideration of these propositions (and they must be considered together) calls for some review of the testimony of the facts surrounding the actual execution of the contract in question.

The testimony of Boyle is to the effect that he had originally become interested in the race track enterprise by reason of his part ownership of the Eastern Engineers; that by reason of the misfortune which had overtaken the enterprise and the Engineers, he had lost all his property and was bankrupt; that he had faith in the future of the race track enterprise and was exceedingly anxious to reorganize it; that he knew that to effect this reorganization, an agreement would have to be reached with the various creditors of the old organization, and with that in mind, he employed Beltzhoover as his counsel to assist him in effecting a reorganization; that he consulted Beltzhoover throughout the negotiations, continuing from August 1st to the date of the November contract, and was fully acquainted with his aims and purposes; that Beltzhoover knew of his plan for a race meet in December; that he, Beltzhoover, had possession of the deed which Corrine R. Mason had executed for a portion of the race track property under the agreement of October 15, 1934, and knew of its importance in connection with the reorganization of the race track enterprise; that after the acquisition of the race track property as a whole, brought about by his purchase at judicial sale and the contract of October 15, 1934, he immediately began arranging for the December race meet; that on November 20th, the date of the contract in question, a large number of horses with their owners and trainers had already arrived at the track; that for the success of the enterprise it was absolutely necessary that this race meet be held and that a failure to hold it would be ruinous, not only to himself, personally, but to the future of the enterprise; that arrangements had been made between him and Beltzhoover to come to the state capitol for the purpose of obtaining the permit necessary to holding the race meet; that under these circumstances,

on November 20th, 1934, in the forenoon, he went into Beltzhoover's office, which was then occupied by him and Betlzhoover jointly, and that when he entered the room, Beltzhoover was engaged in the preparation of a paper, which later developed to be the first draft of the contract executed on that day; that when he, Beltzhoover, had completed the preparation of this paper, be broached the subject of his compensation as attorney for his work in bringing about the reorganization of the race track enterprise, and demanded an equal division with Boyle of stock of the new corporation, the Charles Town Jockey Club; that he, Boyle, resisted this demand, contended that it was unreasonable, and advised Betlzhoover that he was under obligations to take care of other people in the distribution of the stock which he held in said corporation; that Beltzhoover insisted upon his claims to half the stock and said that unless the contract prepared by him was executed, there would be no race meet, that he would not go to Charleston and would not do anything to get the meet started. The proposition was argued for some two hours in the forenoon and was adjourned over the lunch period and in the afternoon, Beltzhoover, who had the Corrine R. Mason deed for a part of the race track property in his possession, waved it in front of Boyle's face and stated "This deed don't go on record until you sign this contract and I know what I am going to get." Boyle states that in view of all these circumstances, he finally signed the agreement. In the course of the discussion leading up to the execution of the contract, Beltzhoover modified his demand with respect to the common stock and agreed to accept four thousand shares of such stock in lieu of the fifty per cent thereof originally demanded. On January 17, 1935, Boyle issued to Beltzhoover certificates of stock in accordance with this agreement. He explains the issuance of these certificates by saying that, inasmuch as he had executed the contract, he assumed Beltzhoover could force him to deliver certificates for said stock.

Whether or not the action of Beltzhoover in the procuring of this contract amounted to actual duress, a point which we do not consider necessary to decide, we do

hold on grounds of public policy that it was such conduct as invalidated the agreement so procured. Actual duress is not necessary to invalidate a contract between an attorney and his client where there are reasonable grounds for the belief that the client has been imposed on. The obligation of an attorney to his client is one of the most sacred known to the law, and every contract between them will be carefully scrutinized to the end that the client's interest may not suffer through a misuse of the power and influence held by the attorney over his client which the very nature of the relationship creates, or through information obtained by an attorney while the relation exists. It seems hardly necessary to cite authority on this point, but in view of the importance of the question involved, it may be well to do so. In 1 Story's Equity Jurisprudence (14th Ed.), section 433, it is stated:

"It is obvious that this relation must give rise to great confidence between the parties, and to very strong influences over the actions and rights and interests of the client. The situation of an attorney or solicitor puts it in his power to avail himself not only of the necessities of his client, but of his good nature, liberality, and credulity to obtain undue advantages, bargains, and gratitudes. Hence the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it often interposes to declare transactions void which between other persons would be held unobjectionable. It does not so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief which may be brought about by means, secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties. By establishing the principle that while the relation of client and attorney subsists in its full vigor the latter shall derive no benefit to himself from the contracts, or bounty, or other negotiations of the former, it supersedes the necessity of any inquiry into the particular means, extent, and exertion of

influence in a given case; a task often difficult, and ill-supported by evidence which can be drawn from any satisfactory sources. This doctrine is not necessarily limited to cases where the contract or other transaction respects the rights or property in controversy, in the particular suit in respect to which the attorney or solicitor is advising or acting for his client; but it may extend to other contracts and transactions disconnected therefrom, or at least where from the attendant circumstance there is reason to presume that the attorney and solicitor possessed some marked influence, ascendency, or other advantage over his client in respect to them."

In *Stockton* v. *Ford*, 11 Howard (U. S.) 232, 247, 13 L. Ed. 676, it was held:

"There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it."

"When a transaction between an attorney and his client is attacked, the burden is cast upon the attorney to prove that it was not influenced by the relationship. He must show that it was made in the best of faith and without disadvantage to the client, that it was fair and equitable, and that the client was fully informed of his rights and interests in the subject-matter of the transaction, of the nature and effect of the transaction itself, and was so placed as to be able to deal with the attorney at arm's length. This is especially true in the case of an assignment or conveyance from the client to the attorney, or where the attorney takes a mortgage from the client."

5 American Jurisprudence, 289, sec. 50.

"While an attorney is under no absolute incapacity to deal with a client, all such transactions are subject to suspicion and close scrutiny, and will be sustained only where they are characterized by the utmost fairness and honesty and the attorney clearly shows that no undue influence was exercised and that the client received the same benefits and advantages as if he had been dealing with a stranger."

7 Corpus Juris Secundum, 964, sec. 127 (a).

"But where the transaction concerns a conveyance or transfer by client to attorney of part of the property involved in litigation, as compensation for legal services therein, the books hold such a transaction presumptively invalid and voidable on principles of public policy and for prevention of wrong, at the election of the client, irrespective of the fairness or unfairness of the contract, provided such election is exercised within a reasonable time."

*Keenan* v. *Scott,* 64 W. Va. 137, 61 S. E. 806.

"Dealings between attorney and client for former's benefit are presumptively invalid as constructively fraudulent, and the *onus* is on him to show that the contract was perfectly fair and was entered into by the client freely and with full understanding as to his rights and to its effect."

*Thomas* v. *Turner's Admr.,* 87 Va. 1, 12 S. E. 149. See also 1 Thornton on Attorneys at Law, secs. 157-8; 2 Leading Cases in Equity 1216-26; *Dickinson* v. *Bradford,* 59 Ala. 581, 31 Amer. Rep. 23; *Lewis* v. *Broun,* 36 W. Va. 1, 14 S. E. 444; *Dorr* v. *Camden,* 55 W. Va. 226, 46 S. E. 1014, 65 L. R. A. 348; *Bruce's Ex'ors.* v. *Bibb's Ex'ors.,* 129 Va. 45, 105 S. E. 570; *Livermon* v. *Lloyd,* 155 Va. 940, 157 S. E. 146. In the case last cited, the court remarks:

"The danger of misunderstandings always impends whenever an attorney undertakes to

make independent personal contracts, having the slightest connection with business matters in which his clients have even the remotest interest. Such transactions always arouse suspicion, generally lead to litigation, and should always be avoided."

In *Elmore* v. *Johnson*, 143 Ill. 513, 32 N. E. 413, 21 L. R. A. 366, 36 Am. St. Rep. 401, it was held:

"In the case of a purchase of the subject matter of the litigation, or of a part thereof, by an attorney from his client, the transaction is presumptively fraudulent, and the burden is on the former to show affirmatively the utmost good faith, the absence of undue influence, a fair price, knowledge, intention and freedom of action by the client, · and also that he gave the client full information and disinterested advice."

Applying these authorities to the facts established by the testimony introduced on behalf of the plaintiff, we reiterate our conclusion that whether or not what occurred at the time of the execution of the contract of November 20, 1934, amounted to duress, in a technical sense, on the part of Beltzhoover, the same cannot stand in equity. *Harris* v. *Cary*, 112 Va. 362, 71 S. E. 551, Ann. Cas. 1913A, 1350, is authority for the proposition that where one has possession or control of the property of another and refuses to surrender it except upon compliance with an improper demand, a contract made by the owner under such circumstances is regarded as being made under compulsion and duress, and that this duress may be created under threats inducing fear of destruction of one's property; or where the necessities of a person are taken advantage of; or where a choice is presented between comparative evils such as the inconvenience and loss by the detention of property, or its loss altogether, and the compliance with an unjust demand. In the *Harris* case, no confidential relationship existed, and yet this doctrine was applied. In the case at bar, a confidential relationship, that of client and at-

torney, did exist, and irrespective of technical duress, any act or conduct on the part of the attorney which deprived the client of freedom of action with respect to property or interests involved in his employment operates to render voidable the contract executed under such circumstances. Accepting the statement of Boyle as true, his future, so far as the race track enterprise was concerned, was absolutely dependent upon his being able to arrange for the December race meet, and in order to assure this meet, it was necessary that the contract of October 15, 1934, be put into effect by the delivery of the Corrine R. Mason deed and the bonds provided for therein. The record discloses that to secure the permit from the racing commissioner, it was necessary to put up $5,000.00 in cash, and $10,000.00 of class "B" bonds, the issuance of which was, of course, dependent upon the Charles Town Jockey Club securing title to the Corrine R. Mason land, and the execution of the deed of trust thereon, along with other property, to secure the payment of the three series of bonds provided for in the October agreement. It was imperative that the Mason deed be delivered, and yet we find that Beltzhoover stated that such deed would not be delivered until his demands were met. The right of Beltzhoover, under ordinary circumstances, to retain the papers in his hands until a fair compensation for his services in connection therewith was paid to him may be admitted; but such admission does not warrant the misuse of the power vested in him by the possession of this particular paper to obtain an agreement as to his compensation, or to demand a part of the property involved in litigation or employment. In the absence of a definite agreement for a share in the stock in question, Beltzhoover had no claim to a single share of this stock. He was entitled to a reasonable compensation for his services in cash, and nothing more. If and when an agreement was made between Boyle and Beltzhoover as to compensation, and such agreement reached under circumstances in which Boyle was free to act, the right of Beltzhoover to retain the papers until the agreement so reached was complied with may be admitted, so long as such retention did not oper-

ate to destroy the very rights which he was employed to create and defend; but we think Beltzhoover made an improper use of his rights in that regard when he forced Boyle to enter into the contract under consideration. There was not that freedom of action on the part of Boyle to which he was entitled in dealing with his attorney. The fact that he had other counsel and did not consult him does not operate to excuse Beltzhoover. Boyle had a right to rely upon Beltzhoover, and he, Beltzhoover, cannot complain when he chose to do so. The time and the circumstances were well chosen to exact from the client a writing which he was unwilling to execute, and full advantage was taken of this situation to the client's apparent prejudice. An agreement procured under such circumstances cannot be upheld in a court of equity.

No serious question is raised by counsel for the appellee as to the duty and obligation of an attorney to his client so long as the relationship of attorney and client exists, but it is contended that at the date of the agreement of November 20, 1934, Beltzhoover's relation as attorney for Boyle had ended. We cannot agree to this contention. As we view the case, it is reasonable to assume that the employment of Beltzhoover was intended to continue until he had completed the task for which he was employed, and that such task included everything necessary to set in operation the business for which the Charles Town Jockey Club was organized; nor do we think it can be said that such relationship had terminated so long as Beltzhoover retained in his possession, and without legal delivery to the Jockey Club, the Mason deed. Certainly it cannot be said that the Jockey Club was in position to go ahead with its enterprise so long as this particular deed remained undelivered, for without that delivery everything of value accruing to the Club under the October agreement would have broken down, and Boyle would have remained just where he was when he employed Beltzhoover in the first instance. An attorney may not terminate his relationship at will. The right of a client to discharge his attorney is ever present, subject to the attorney's right to compensation; but an attorney may not terminate his relationship without no-

tice to his client, in any event; and particularly where by so doing he places himself in a position where he can make use of information or other advantages secured while the employment was in existence.

> "An attorney's authority to act for his client continues until the end of the litigation, or until the discharge of the particular purpose for which he was retained, unless the relation is sooner brought to an end by the revocation of his authority."

and

> "An attorney cannot, alone and of himself, terminate the relation to the injury of his client; although the client may end it at any time, without notice, and without showing any cause therefor."

3 American and Eng. Ency. of Law (2d Ed.), 327-8.

> "Among the fundamental rules of ethics is the principle that an attorney who undertakes to conduct an action impliedly stipulates to carry it to its termination, and he is not at liberty to abandon it without reasonable cause."

5 American Jurisprudence, 282, sec. 39. See also 7 Corpus Juris Secundum 940-3. Furthermore, even if there had been a termination of the relationship, the rule which requires the strictest of fair dealing between client and attorney applies so long as the influence created by the relationship continues. *Davis* v. *Henry,* 4 W. Va. 571; *Elmore* v. *Johnson, supra; Thomas* v. *Turner's Admr., supra; Sedgwick's Curator* v. *Taylor,* 84 Va. 820, 6 S. E. 226; 1 Thornton on Attorneys at Law, sec. 153.

The appellee further contends that even if Boyle had a right to a rescission of the agreement, he lost that right by acquiescence therein and by affirmation or ratification thereof, and it also appears that the question of laches on the part of Boyle in asserting his right to rescind the agreement is involved.

The holding of the trial court was that the plaintiff was not guilty of laches, but that he had ratified the agreement by acquiescence; and in the brief filed by counsel for the appellee, it is contended that the contract was ratified by the act of issuing to Beltzhoover certificates for the shares of common and preferred stock mentioned on January 17, 1935, some sixty days after the date of the contract. While the said contract could have been ratified by Boyle, we are not disposed to hold that his act in issuing the stock in question, under the circumstances amounts in law to a legal ratification thereof. Ratification of a contract tainted with any weakness sufficient to destroy it must be a solemn and deliberate act, and where a waiver of a right to attack the contract for such weakness is relied upon, it must have been made with full knowledge of the rights intended to be waived. *Montague's Admr.* v. *Massey*, 76 Va. 307; *Wilson* v. *Carpenter's Admr.*, 91 Va. 183, 21 S. E. 243, 50 Am. St. Rep. 824; *Fitzgerald* v. *Frankel*, 109 Va. 603, 64 S. E. 941; *White* v. *American Nat. Life Ins. Co.*, 115 Va. 305, 78 S. E. 582. It must also be borne in mind that a confidential relationship between Boyle and Beltzhoover still continued, whether that continuance may be laid to the original employment or to that created by the contract claimed to have been ratified. One of the stipulations of the contract was that Boyle and Beltzhoover should continue to work together in the Charles Town Jockey Club for their mutual interest and protection. The evidence is clear that at the time of the issuance of this stock, both Boyle and Beltzhoover were interested in securing legislation under which they would be able to operate the race track under more advantageous conditions, and this more or less intimate relationship continued until some time in July, 1935, when the break between them seems to have been complete. At the time of this so-called ratification, the future of the race track was uncertain because of legal restrictions which later were, in some measure, removed when new legislation was enacted. The fact that Boyle did not protest a statement made by Beltzhoover to a legislative committee, asserting his ownership of substantial interest in the Jockey

Club, and the further fact that in a notice given by him, he stated his ownership stock to be such as to exclude the stock claimed by Beltzhoover under the contract, while not relied upon in the brief of the appellee, should be noted here. Under the circumstances, we do not think the failure of Boyle to protest against the statement made by Beltzhoover, or the recognition indirectly given by him to Beltzhoover's ownership of stock in the notice mentioned, are sufficient to operate as a ratification of the November contract, or a waiver of the right to attack the same. Holding as we do that the execution of this contract was, considering the relationship of the parties, obtained by improper means, we are not disposed to weaken the effect of that ruling by holding that an agreement obtained under such conditions can be held to be ratified, except upon the clearest proof of every element necessary to make that ratification effective, such as freedom of action, full understanding and kindred requirements. The case is different from that where two parties, dealing at arm's length, enter into an agreement which, on account of some defect therein, may be avoided, but which through conduct of the parties may be held to be ratified. It requires a stronger proof of ratification in the case of a fiduciary or confidential relationship than where parties are dealing upon an equal footing.

The question of laches on the part of Boyle in instituting his suit requires some consideration. There would appear to be many reasons why the doctrine should apply in this case. Mere lapse of time does not ordinarily control; changed conditions, especially the value of property, or losses to which a party may be subjected by reason of delay, have more weight. In this case at the time of the contract under attack the value of the stock of the Charles Town Jockey Club was uncertain. Up to that time the operation of a race track at Charles Town had not been profitable. Between the date of the contract and the date of the institution of this suit, at least one successful race meet had been held, and it may reasonably be contended that there had been an increase in the value of the stock in controversy. On the other hand, the defense of laches in a case such as this is not regarded

with favor, and especially not where the client may be under the control of the original influence. 1 Thornton on Attorneys at Law, sec. 163. "It is extremely difficult for a confidential agent to set up an available defense grounded upon the laches of his employer." *Keenan* v. *Scott, supra.* A situation requiring action on the part of Boyle may not clearly be said to have arisen until about July, 1935, when Beltzhoover made an attack upon Boyle's right to any of said stock. The suit at bar was instituted some three months after that development. Previous to July, it may be contended that Boyle was warranted in waiving his claim of right to attack the November contract because of the fact that by the contract itself, the cooperation of Beltzhoover in the operation of the race track seemed assured. Boyle may reasonably have believed that, whatever his rights with respect to having the contract cancelled, it would be to his interest to waive those rights rather than embark upon litigation, the outcome of which, and its effect on the business, might be uncertain. We cannot say that the influence acquired by Beltzhoover while attorney for Boyle had passed at the date of the issuance of the certificates for the stock in question, or at the date of the legislative hearing. The burden of showing ratification under circumstances when Boyle was free to act was on Beltzhoover, and that burden has not been met. Under this view, the delay in the institution of this suit after July, 1935, cannot be held to be unreasonable; and, as indicated above, the vice in the November contract being of such character as to warrant us in holding it to be in violation of sound public policy governing the relationship of attorneys to their clients, we do not feel that a strict rule with respect to laches should be invoked herein. *Bruce's Ex'ors.* v. *Bibb's Ex'ors., supra.* This is not a case where the refusal to invoke the doctrine of laches takes from the appellee the right to which he was originally entitled. His primary right to a fair compensation for the services rendered by him to the plaintiff remains, and the court below, on the further development of this case, will protect him in that right.

The decree of the circuit court of Jefferson County dis-

missing the plaintiff's bill is reversed and the cause re-
manded for further proceedings in that court.

*Reversed and remanded.*