# CHARLESTON

RALPHSNYDER v. TITUS *et al.*

Submitted February 24, 1914.   Decided April 28, 1914.

1. ATTORNEY AND CLIENT—*Contracts—Validity—Specific Performance.*
   Where an attorney, employed in litigation involving real estate,
   procures from his client, for himself, upon a grossly inadequate con-
   sideration, a contract for the sale thereof, equity will not, at the
   suit of the attorney, decree specific performance.   (p. 208).

2. SAME—*Contracts—Invalidity.*
   At the election of the client, if exercised with reasonable prompt-
   ness, equity will, in the absence of conclusive evidence to the con-
   trary, treat such contract as presumptively invalid and voidable.
   (p. 208).

3. SAME—*Contract—Validity.*
   A case in which these principles are applied, and relief denied.
   (p. 208).

Appeal from Circuit Court, Monongalia County.

Bill by I. C. Ralphsnyder against Amandaville E. Titus
and others.   Decree for defendants, and plaintiff appeals.

*Affirmed.*

*W. S. Meredith,* for appellant.

*Moreland, Moreland & Guy,* for appellees.

LYNCH, JUDGE:

Can an attorney, employed to secure the avoidance of a con-
tract for sale of real estate in part because of inadequacy
of price, purchase the land at the same rate per acre, he
to have the excess as compensation for his services?   The
circuit court having, on the facts, answered in the negative,
Ralphsnyder seeks review and reversal here.   As the circuit
court did, so must this court, answer only upon the facts dis-
closed by the record.

In 1886 Eli Titus conveyed 112 acres of land to Albert G.
Titus in trust for the use and benefit of Benjamin Titus and
wife for life, and thereafter in fee to their children—Amanda-
ville E. Titus, Edith A. Titus and Olive N. Titus, the latter

of whom married John L. Fogg and died, pending the suit, intestate and without issue, her husband surviving her.

Benjamin Titus having been adjudged insane in the sense that he was incompetent to engage in ordinary business dealings, Josephus Cole was appointed his committee. Cole filed a petition in the circuit court to obtain authority and permission to sell at the price of $30 an acre the Pittsburgh seam of coal underlying the lands. Amandaville E. Titus and her sisters, deeming the price inadequate, employed I. C. Ralphsnyder, an attorney practicing in Monongalia county, to prevent the sale, secure revocation of the order adjudging Benjamin Titus *non compos mentis* and appointing Cole as committee, and to act for other purposes as their legal adviser.

According to the dates named by Ralphsnyder, the first interview was June 3, when they informed him of the nature of the business; the second June 4, when he made an examination of the proceedings to be investigated by him; the third on June 5, 1901, when he obtained the contract with the owners of the land. These dates are important, chiefly because of an attempt to sustain Ralphsnyder's right to contract with the land-owners, on the theory that at that date he was not their attorney. But, as he admits in his testimony he was then their counsel, that contention is dismissed without further consideration.

As appears from the contract, signed by all the owners of the land, but not acknowledged by any of them, Ralphsnyder agreed to buy and they to sell and convey all the Pittsburgh seam of coal within the 112 acres at the rate of $30 an acre, he to have the excess in value as compensation for his services.

The coal was not sold, or if sold the sale made by Cole and sought to be approved in the proceedings by him as committee was not consummated, probably through the services of Ralphsnyder, who then demanded a deed pursuant to the terms of the contract. This demand being refused, he instituted this suit to compel a conveyance, and to remove as clouds on the title other contracts subsequently made for the sale of the coal, in some of which the price of $100 an acre is named as consideration. He charges these contracts to be fraudulent and void as to him, and prays their cancellation.

By answers, defendants put in issue, by express denial, the material averments on which Ralphsnyder bases his claim for relief, except as to the employment and execution of the contract; and, in addition, aver fraud in its procurement. They charge that the contract was solely one of employment, and was not intended or understood by them at the time as an agreement for the sale of the coal at any price, but as a contract for his services as attorney to represent them in the proceedings in court then pending or subsequently instituted. They further aver their lack of knowledge and business experience, whereby they were misled and deceived by fraudulent and false interpretation by Ralphsnyder of certain provisions of the contract, as to the meaning of which they made inquiry, to which they say he replied they·"meant nothing"; that, but for their faith and reliance on his integrity and loyalty to their interests, and their belief in the verity of his statements, they would have refused to sign the contract. They further charge and aver it was "an open and notorious fact", known to Ralphsnyder as well as to them, that at the date of the contract the Pittsburg vein of coal near the Titus lands was under option at the rate of $100 an acre and subsequently purchased thereunder at that price; and that, as they understood the contract, Ralphsnyder was to prevent a sale by the committee, that they might sell at the price then prevailing in that territory. By way of affirmative relief, they pray cancellation of the contract.

The evidence touching these variant charges is, of course, contradictory and conflicting, much of it without probative value. In some respects, however, it is sufficiently conclusive to warrant an affirmation of the decree of which complaint is made.

The difference between the market value of the coal at the date of the contract and the price Ralphsnyder agreed to pay is manifest, as is also his knowledge of the disparity. Whether disproportionate to the value of his services, it is not necessary to say; indeed there is no definite proof of the extent or value of the services rendered by him. Although as a witness in his behalf he says $30 an acre was at the date of the contract an adequate consideration for the coal, he admits knowledge of the selling prices for coal lands in that

locality, and as a basis of information says his father owned coal properties near the Titus land and that he himself had experience in the mining business. But, to avoid the effect of this admission, doubtless not previously perceived by him, he, a few months later, denied knowledge of coal property values, assigning as reason for lack thereof his absence in Alaska in the winters of 1898 and 1899 and his subsequent residence at Kingwood, a. short distance from Morgantown, the county-seat of the county in which the Titus lands are located. Besides, on June 11, 1901, six days after the date of the contract, he prepared and secured from his clients affidavits, as he admits, in which they say, though not in the same language, "that the price of $30 per acre for said Pittsburgh vein of coal under said land is not one half the actual value of said vein of coal, and I (affiant) will be greatly injured and damaged by the sale of said vein, and particularly so at the ridiculously low price of $30 per acre; and that my said sisters will be greatly damaged by the sale of said coal". Some of the defendants, examined in their own behalf, testify to statements made by plaintiff at the same time, statements not denied by him, that it was outrageous to let the coal be sold for $30 per acre when it would bring $100; "it would be a great injury to you people to let Josephus Cole sell your coal for $30 an acre, when you can sell it for $100 an acre".

That the consideration named in the contract was at least apparently grossly inadequate, appears from a contract made part of the record, dated May 6, 1901, for the sale of about 2500 acres, including the Titus lands, at the rate of $110 per acre, on which payments were made after acceptance by the optionee. That this sale was generally known in the district in which these lands are located abundantly appears from the record, but of which plaintiff says he was ignorant. It was freely discussed there and elsewhere, and published in local newspapers of general circulation in the county. This contract, although not made by the land-owners, was made by those to whom they had previously optioned their coal. The excess in the proceeds, above the rate payable to his clients, would, when paid, pass to plaintiff under the terms. of his contract. For it also provides that "all moneys and other

things of value'', which they may receive or be entitled to receive for their interests in the coal in excess of $30 per acre, he was to have as compensation for such services. These are the provisions which, according to their testimony, he said meant nothing.

While ordinarily he who charges fraud must prove it, the rule is not universal in its application. The burden often shifts to the person whose conduct is assailed as fraudulent, especially where there exists between the parties a· trust or confidential relation. Under such .circumstances, 'he who claims the benefit of the contract assumes the burden of proving freedom from the taint of fraud. ''No closer or more confidential relation can exist in matters of business between parties than that of client and attorney; and, while such relation exists, an attorney can not allow his personal interests, in any way, to become antagonistic to those of his client, without at once giving the client full information thereof''. *Roller* v. *McGraw*, 63 W. Va. 462. ''Where, after such relationship has been established, the attorney procures from the client a conveyance to himself of part of the property involved in litigation as compensation for his legal services therein, such conveyance will be deemed presumptively invalid and voidable, on the principles of public policy and for prevention of wrong, at the election of the client, irrespective of the fairness or unfairness of the contract, provided such election is exercised within a reasonable time''; and ''all purchases of outstanding interests by the attorney will be adjudged in trust for the client''. *Keenan* v. *Scott*, 64 W. Va. 137. These principles, deemed applicable and applied to the facts detailed, are so well sustained by authority, and so consonant with reason, that further discussion is unnecessary.

But plaintiff insists upon reversal of the decree of which he complains, because of the absence of a necessary party. This is the second time the case has been before this court. On the first appeal, it was reversed for want of proper parties. Even before the submission of the cause for the first decree appealed from, plaintiff knew, as appears from his testimony, the claims asserted by the person not then or since made party to the cause. If, with this knowledge, he failed to convene all persons claimed to be interested, the fault is

attributable to his negligence or indifference, excusing grant of further opportunity for that purpose. But, in no event, can plaintiff be prejudiced by absence of him who he now asserts should have been before the court before the final decrees were pronounced. Even his presence would not avail; because, if plaintiff is not entitled to relief against any of those now parties to the litigation, he would not be entitled to relief against him who is not, but who he claims should have been made, a perty. 1 Hogg. Eq. Proc. 362; *McKay v. McKay,* 28 W. Va. 514; *Mitchell* v. *Chancellor,* 14 W. Va. 22.

We affirm the decree.

*Affirmed.*