BANK OF MILL CREEK

*v.*

THE ELK HORN COAL CORPORATION, *et al.*

*and*

HARRY W. ALLERS, *et al*

*v.*

THE ELK HORN COAL CORPORATION, *et al.*

(No. 10080)

Submitted October 4, 1949. Decided February 14, 1950.

640

GIVEN, JUDGE, not participating.

*Rummel, Blagg & Stone, Robert S. Spilman, Kenneth E. Hines,* for appellants.

*Jackson, Kelly, Morrison & Moxley, Thomas B. Jackson, W. Goodridge Sale, Jr., David D. Johnson, Crisona Bros., James J. Crisona,* for appellees.

LOVINS, PRESIDENT:

On this appeal Arthur B. Koontz, in his own right, Arthur B. Koontz, administrator, c.t.a., of the estate of Patrick D. Koontz, George Ward, surviving trustee, Carl W. Clayton, Harry B. Crane, J. H. Wheelwright, C. W. Wheelwright, J. F. Caulfield, Arthur W. Smith, Maude Copeland Haas, Frank Haas, Joyce Davis, R. Kinnaird, Thomas L. Muncaster, F. W. Boyce, William Courtney and Mrs. J. N. Camden, the last two named being executors of the estate of J. N. Camden, and Mrs. Sprigg D.

Camden, complain of a decree entered in this suit by the Circuit Court of Ohio County, West Virginia.

Arthur B. Koontz is a stockholder in The Elk Horn Coal Corporation, and is administrator, c.t.a., of Patrick D. Koontz, deceased, who was likewise a stockholder in said corporation. George Ward is the successor and surviving trustee in a certain voting trust, hereinafter mentioned. Carl W. Clayton and the other persons, whose names are set forth above, are stockholders in said corporation, owning an aggregate of 21,723 shares of the stock of the corporation, the classes of which are not disclosed by the record.

The background of this suit involves the operation of two corporations. The first corporation was known as Elk Horn Coal Corporation, which was organized in the year 1915, and continued its operation without a great deal of interruption until the year 1931, at which time it was placed in the hands of a receiver in a suit prosecuted in Letcher County, Kentucky. In 1935, having a large funded indebtedness, the amount of which is not clearly shown by the record, and outstanding capital stock, common and preferred, amounting to $18,600,000.00, the first corporation was placed in bankruptcy in the United States District Court for the Southern District of Ohio, Western Division, and C. W. Watson, who had been receiver in the suit mentioned above, was appointed trustee. In the year 1937 a plan of reorganization, under Section 77-B of the Bankruptcy Act, was adopted and approved, from which emerged the present corporation, having the same name as the old one with the addition of the word "The", which new corporation will be hereinafter referred to as "Elk Horn."

Numerous current and funded liabilities existed and the plan contemplated that three classes of capital stock should be issued, being first preferred, second preferred and common.

As a necessary and integral part of such reorganization, Western Pocahontas Corporation, a wholly-owned sub-

sidiary of The Chesapeake and Ohio Railway Company, hereinafter referred to as "Pocahontas", advanced the sum of $1,500,000.00 to Elk Horn, and as security for such loan Elk Horn conveyed to Pocahontas approximately 53,000 acres of land, containing approximately 42,000 acres of coal lands, together with all mining plants and equipment thereon. Upon the conveyance being executed, Pocahontas leased the land so conveyed to Elk Horn under an agreement providing for certain payments to be made over a period of twelve years, which payments, at Elk Horn's option, could be applied on an option to repurchase for $1,500,000.00. Although said payments are treated as rentals and royalties in the agreement between Elk Horn and Pocahontas, the arrangement, in fact, probably amounted to no more than a mortgage made by Elk Horn to secure the loan of $1,500,000.00. However, we do not pass upon the effect and status of that agreement.

There is no controversy that Watson was the moving spirit in procuring the loan, assisted in a measure by Arthur B. Koontz, one of the appellants. There was a tacit understanding between the officers and agents of Pocahontas and Elk Horn that its management and operation should be controlled by Clarence W. Watson, and, in the event of his death, Arthur B. Koontz would succeed to such control, in order to carry out its understanding with Pocahontas. Implementing such understanding, voting trustees were to be appointed who, for all practical purposes, could control Elk Horn.

Elk Horn agreed to issue and deliver to the voting trustees 120,000 shares of the common stock of Elk Horn, and such trustees agreed to issue to the rightful owners thereof voting trust certificates, which will be hereinafter referred to as "certificates." The stock issued under the agreement was to be voted by the trustees, the holders of said certificates having no right to vote or participate in the management of the corporation, with certain exceptions not material to this inquiry.

The agreement under which the voting trust was set up is lengthy and provided for many and varied contingencies,

events and occurrences. It was provided that the voting trust should end on March 1, 1947, unless sooner terminated under the provisions of the agreement by the holders of the voting trust certificates. It is further provided that: "Any Trustee or any firm of which he may be a member, or any corporation of which he may be a stockholder, director or officer, may contract with the company or he may be or become pecuniarily interested in any matter or transaction to which the Company may be a party, or in which it may be in any way concerned, as fully as though he were not a Trustee." It would serve no purpose to discuss fully the many provisions of the trust agreement. It suffices to say that the original trustees are now deceased, and that appellant, George Ward, is the sole surviving trustee thereunder.

From the inception of the old corporation, as well as the new one, and up until the time of his death on May 24, 1940, Clarence W. Watson seems to have controlled the policies of both corporations, and at various times seems to have incurred certain debts due Elk Horn.

At a meeting of the board of directors of Elk Horn on June 10, 1937, the board, by resolution, determined Watson's indebtedness to Elk Horn as of March 1, 1937, to be $219,000.00 and provided that the same should be reduced at the rate of $3,333.00 per month and that none of said debt should bear interest. The resolution further provided that Watson be employed as president of Elk Horn for three years, commencing March 1, 1937. In consideration of the employment aforesaid, Watson was to receive, in addition to an annual salary of $18,000.00, and the reduction of his indebtedness above mentioned, forty thousand certificates and options to thereafter purchase a total of sixty thousand additional certificates at ten cents per share. It is admitted that pursuant to said resolution, a contract was entered into between Watson and Elk Horn carrying out the purposes of the resolution.

On the same date the board, by another resolution, authorized the delivery of twenty thousand certificates to

Arthur B. Koontz, and the officers of Elk Horn were directed to take the necessary steps to carry out and effectuate the resolution so adopted.

Watson exercised the option to purchase the sixty thousand certificates. In one instance he bought forty thousand certificates, and gave his note for $4,000.00 in a collateral form, which, in addition to securing the sum of $4,000.00, also secured all other debts which Watson owed Elk Horn. The purchase of twenty thousand certificates was made by a note of $2,000.00, which likewise provided that said certificates should be deposited as collateral security for the payment of said note. At one time, not clearly disclosed by the record, the option set forth in the above resolution was also used as collateral security for some debt or debts owed by Watson to Elk Horn. However, prior to the receivership hereinafter mentioned, the $4,000.00 note provided that the 40,000 certificates should only be collateral security for the note given as their purchase price, and the $2,000.00 note provided that the 20,000 certificates deposited with it should not only be collateral security for the payment of the purchase price note, but also for other debts of Watson.

Watson died on May 24, 1940, wholly insolvent, and at the time of his death the original debt of $219,000.00 had been reduced until it amounted to approximately $85,-825.50. In addition thereto the notes of $4,000.00 and $2,000.00 above mentioned remained unpaid, and the 60,-000 certificates remained in the hands of the corporation as collateral security as above noted.

This suit was commenced in the Circuit Court of Kanawha County by the Bank of Mill Creek, alleging its ownership of thirty-two shares of first preferred stock of Elk Horn. The bill further alleged that Elk Horn owned approximately 18,466.66 acres of land in fee; 128,853.16 acres of minerals; and 815.85 acres of surface, and a large amount of personal property. Plaintiff bank further alleged that Elk Horn owed numerous debts, current and funded, and that although the assets of the corporation were sufficient

to discharge all of said debts, they were frozen and could not be utilized to pay the same, and, because of default in some of its funded debts, a creditor of Elk Horn would, unless prevented, foreclose its lien on a valuable part of the lands and personal property above mentioned. In accordance with the prayer of the bill, W. W. Goldsmith and Howard N. Eavenson were appointed receivers by the Circuit Court of Kanawha County, and in an ancillary proceeding brought in Letcher County, Kentucky, the said Goldsmith, Eavenson, and J. J. Moore were appointed ancillary receivers in the State of Kentucky. J. J. Moore having died, Thomas S. Haymond is now one of the ancillary receivers.

The firm of Koontz and Koontz, consisting of Arthur B. Koontz and Patrick D. Koontz, with whom W. W. Goldsmith was associated, was employed as counsel for the primary receivers.

The receivers were not authorized to take possession of all the properties of Elk Horn. Although Elk Horn owned properties in West Virginia and Kentucky, it seems that none of the properties in West Virginia was operated for mining purposes, and the ancillary receivers in the State of Kentucky were the operating receivers.

Many reports were filed in the Circuit Court of Kanawha County by the primary receivers, as well as by the ancillary receivers in the State of Kentucky, and, without going into detail, it may be said that from the time of the appointment of the primary and ancillary receivers until the filing of the petition hereinafter mentioned, the operation of Elk Horn by the receivers was such as to redound to the benefit and advantage of Elk Horn. In particular the agreement between Elk Horn and Pocahontas was revised to the advantage of Elk Horn, in such manner that an accrued indebtedness amounting to approximately two hundred thousand dollars was released, and the time for payments under the agreement was extended.

What has been said heretofore is the background of the real controversy presented by this appeal, which involves

only the purchase of 98,000 certificates by Arthur B. Koontz and Patrick D. Koontz.

It will be remembered that 60,000 of said certificates were pledged to Elk Horn to secure debts due from Watson to Elk Horn. On the 6th day of December, 1941, a decree was entered by the Circuit Court of Kanawha County, authorizing and directing the sale of the 60,000 certificates by the primary receivers. The sale was advertised in The Charleston Gazette for two weeks; and on the 20th day of December, 1941, the receiver, W. W. Goldsmith, cried off said shares to H. D. Kinsey, who was not present in person but was represented by a local attorney, at the price of $7,500.00. Kinsey was the husband of the Koontzes' niece, and Goldsmith knew that the purchase was actually made by Kinsey's attorney on behalf of Arthur B. Koontz and Patrick D. Koontz. Eavenson was likewise apprised of the interest of the Koontzes shortly after the sale was made and before confirmation thereof.

The receivers reported the sale and recommended that it be confirmed to Kinsey, but failed to disclose the fact that the Koontzes were the real purchasers.

The remaining 38,000 certificates were purchased for the Koontzes at sales conducted by the personal representatives of C. W. Watson's estate which, as has been stated, was insolvent. The 38,000 certificates were a part of the 40,000 certificates issued to Watson pursuant to the contract made as a result of the resolution of June 10, 1937, heretofore described.

Following Watson's death, a domiciliary administrator for his estate was appointed in this State, and an ancillary administrator was appointed in Hamilton County, Ohio. Various large claims were presented against the ancillary administrator, totalling $163,663.00, all of which were ultimately purchased by the receivers of Elk Horn for $850.00, thus leaving Elk Horn as the sole creditor of the Watson estate situate in Ohio. On May 17, 1944, a private sale was conducted by the ancillary administrator, at which H. D. Kinsey, again acting in the Koontzes' behalf,

purchased various securities belonging to Watson's Ohio estate for $22,500.50, plus a fee for collection of $25.32. Among the securities so sold were 28,000 of the certificates heretofore mentioned. All the securities so purchased by Kinsey have since been resold, except the 28,000 certificates, which, after deducting the proceeds of the re-sale of the other securities, cost the Koontzes approximately $5,508.50.

In addition to the other debts owed Elk Horn by the Watson estate, hereinbefore discussed, the receivers also purchased for $700.00 approximately $140,000.00 worth of claims against Watson's domiciliary administrator so that altogether Elk Horn's receivers owned approximately forty per cent of the claims against the said domiciliary administrator. The $140,000.00 claims were a part of the $163,663.00 in claims mentioned above. On May 22, 1944, the domiciliary administrator sold, at private sale, 10,000 certificates to Frank Shaver for $2,000.00. Shaver is bookkeeper for the Koontzes, and admittedly purchased the 10,000 certificates in their behalf.

Until impounded by the court, all certificates were held by Arthur B. Koontz, with assignment and power of attorney to transfer in blank. According to the records of the voting trustees, the owner of the 60,000 certificates and the 28,000 certificates is H. D. Kinsey; the owner of the 10,000 certificates is the estate of Clarence W. Watson.

According to balance sheets of Elk Horn as of March 31, 1944, December 31, 1944, and December 31, 1945, the common stock was valued at five dollars per share. The value of these 98,000 certificates is problematical, as considerable trading in "over-the-counter lots" causes the value of the common stock to fluctuate, and for the further reason that during the existence of the voting trust agreement, the owner of the certificates was not entitled to voting rights, as heretofore shown. Some of the litigants assert that they possibly have a value of over twelve dollars a share now, but the record shows clearly that on any of the pertinent dates hereinbefore referred to, the certificates had little,

if any, value, and since that time have come to be of considerable value on the open market.

On February 4, 1946, Harry W. Allers, Lionel W. Rosenbaum, and Joseph List, as a committee representing the holders of the 7,600 shares of first preferred stock of Elk Horn; James N. Smith, Howard H. Hubbard, and J. O. Straus, a committee representing the holders of 6,100 shares of second preferred stock of Elk Horn; and Verne M. Alexander, Walter MacNaughten and Sol Nathan, a committee representing the holders of 14,600 shares of common stock of Elk Horn, filed a petition in this suit, alleging in substance, that Elk Horn was able to pay its debts; that a continuation of the receivership was damaging the stockholders and preventing them from exercising control over the property of Elk Horn; that certain personal property of Elk Horn could be sold; and that they had not been kept informed of the acts and conduct of the receivers. The petitioners prayed that the receivers by required to account for all their receipts and disbursements, and that the receivership be terminated. It should be noted here that none of the petitioners, who will be hereinafter referred to as "appellees," was a stockholder on the dates of the sales of the certificates heretofore described, having acquired their stock subsequent thereto.

The primary receivers, Goldsmith and Eavenson, filed their Receivers' Report No. 41, which went into some detail, and prayed that it be treated as an answer to the petition of Allers and others.

Patrick D. Koontz and Herbert L. Carney, voting trustees under the voting trust agreement, hereinabove mentioned, along with fifteen other stockholders holding an aggregate of 21,723 shares, who are the appellants here with Arthur B. Koontz and George Ward, filed a cross-petition opposing the termination of the receivership. Elk Horn in its corporate capacity filed an answer to the petition of Allers and others opposing the discharge of the receivers.

Although not pleaded in the original petition of Allers and others, it appears that at the outset of the hearings

had thereon, counsel for appellees questioned the sales of the 98,000 certificates to the Koontzes. On July 23, 1946, after various hearings had been had, in which no serious objection to the conduct of the receivership in either of its branches was disclosed, except the sales of said certificates, the petitioners filed an amended and supplemental petition alleging that the purchase of the certificates was fraudulent in law and in fact. The amended and supplemental petition prayed that the Koontzes be divested of all legal title, and the beneficial ownership of said 98,000 certificates and the shares of stock represented by them; that Goldsmith be removed as a receiver; that the Koontzes be denied compensation as counsel for the receivers; and for other relief unnecessary to mention.

On December 18, 1946, the Circuit Court of Kanawha County ordered that this cause be removed to the Circuit Court of Ohio County, pursuant to the provisions of Code, 56-9-2, for decision by the Honorable J. H. Brennan, Judge of that court.

W. W. Goldsmith in his own right, and as co-receiver, answered the original petition and the amended and supplemental petition filed by Allers and others. In the meantime Herbert L. Carney having died, Patrick D. Koontz, in his own right and as surviving voting trustee and cross-petitioner, along with other stockholders, who are appellants here, including Arthur B. Koontz, but excluding George Ward, filed an answer to the amended and supplemental petition. Elk Horn filed its separate answer and Howard N. Eavenson filed his separate report and petition as co-primary receiver. To all of the above-mentioned pleadings, Allers and his co-petitioners filed general replications.

So far as it is necessary to detail, the Koontzes freely admit that Kinsey and Shaver purchased the certificates according to an arrangement theretofore made by them. Arthur B. Koontz assumes the position that he was bound by the tacit agreement between Watson and himself on the one side and Pocahontas on the other to retain control of Elk Horn; that the purchase price of the 98,000 certifi-

cates paid in each instance was worth as much as or more than the same would have sold for on the open market; that no wrong, fraud or over-reaching was engaged in by them; and that the receivership estate suffered no real injury.

Before final decree Patrick D. Koontz, one of the original trustees under the voting trust agreement, died and upon motion the proceedings were revived in the name of George Ward, surviving voting trustee and cross-petitioner. The proceeding was also revived in the name of Arthur B. Koontz, administrator, c.t.a., of the estate of Patrick D. Koontz.

On February 20, 1948, the Circuit Court of Ohio County entered a final decree on the phase of the case now before us, decreeing that said 98,000 certificates and the common stock represented thereby were impressed with a trust for the benefit of the receivers of Elk Horn; requiring Arthur B. Koontz, individually and as administrator, c. t. a., of Patrick D. Koontz to forthwith transfer to the primary receivers all of said certificates; that Arthur B. Koontz, individually and as administrator, c. t. a., be reimbursed in the sums of $7,500.00, $5,508.50, and $2,000.00, the amounts paid by the Koontzes for said certificates, with interest thereon from the time of the respective purchases until paid to Arthur B. Koontz, individually and as administrator, c. t. a., of Patrick D. Koontz; that there be issued to the receivers of Elk Horn stock certificates for 98,000 shares of the common stock of Elk Horn, upon surrender of the certificates representing said shares; appointed special commissioners to make sale of said stock and to report said sale for confirmation; and directed that said special commissioners, after payment of the expenses of sale, hold the proceeds thereof subject to the further order of the court.

From that decree Arthur B. Koontz and others, as hereinabove stated, appealed to this Court, making assignments of error which substantially present the following questions:

(1) Are the stockholders of Elk Horn, who acquired their stock after the sales of the certificates, barred of relief;

(2) Is the relief prayed for by appellees barred by laches;

(3) Is the sale of the 60,000 certificates made by the primary receivers to the Koontzes void, voidable, or valid;

(4) Are the sales of the 28,000 and 10,000 certificates made by the ancillary and domiciliary administrators of C. W. Watson void, voidable, or valid;

(5) If the decree of the trial court, in so far as it determines the foregoing questions, be without error, the following questions arise with respect to the relief decreed appellees by the trial court:

(a) Should the 98,000 certificates, or any part thereof, be impressed with a trust for the use and benefit of the primary receivers of Elk Horn;

(b) Should Arthur B. Koontz, in his own right and as administrator, c. t. a., of Patrick D. Koontz, be compelled to transfer and deliver all evidences of title and the right and ownership of the 98,000 certificates to the primary receivers;

(c) Should the surviving trustee in the voting trust agreement be required to cause the issuance of 98,000 shares of the common stock of Elk Horn to the primary receivers upon surrender of all certificates;

(d) Is it proper to direct a sale of the shares of common stock of Elk Horn to be made by special commissioners;

(e) Was it necessary for the court to adjudicate all claims against the common stock and the disposition of the proceeds of the sale thereof before a sale was decreed; and

(f) Should Arthur B. Koontz, in his own right and as administrator, c. t. a., of Patrick D. Koontz, be required to account for the proceeds of the sale of securities other

than the 28,000 certificates purchased from the ancillary administrator of C. W. Watson?

Inasmuch as we deem that the trial court's decree affected adversely only Arthur B. Koontz, in his own right and as administrator, c.t.a., of Patrick D. Koontz, reference hereinafter to "appellants" will refer only to Arthur B. Koontz, in his dual capacity as aforesaid.

If appellees are barred from the relief they seek, because they were not stockholders of Elk Horn at the time of the sale and the purchases of the certificates, a discussion and application of that principle would dispose of this appeal. There is a conflict of authority as to the right of a stockholder to maintain a derivative suit for the benefit of the corporation based on fraud or misconduct detrimental to the corporation's rights occurring prior to the acquisition of any stock by the complaining stockholder. Many courts, including the Supreme Court of the United States, hold that such suit cannot be maintained.

In the case of *Hawes v. Contra Costa Water Co.*, 104 U. S. 450, 26 L. ed. 827, it was held that a complaining stockholder must have been the owner of stock on which his right to sue depends at the time the transactions of which he complains occurred, or that the stock has "since devolved on him by operation of law." The *Contra Costa* case was followed by a similar holding in the case of *Dimpfel v. Ohio, etc., R. Co.*, 110 U. S. 209, 3 S. Ct. 573, 28 L. ed. 121. The foregoing principle has been embodied in Rule 23 of the Federal Rules of Civil Procedure, and has been rigidly adhered to by the Federal courts. See *McQuillen v. National Cash Register Co.*, 112 F. 2d 877, and *Robinson v. West Virginia Loan Co.*, 90 F. 770.

Many state jurisdictions have adopted the same rule. See *Alexander v. Searcy* (Ga.), 8 S. E. 630; *Home Fire Ins. Co. v. Barber* (Neb.), 93 N. W. 1024; *Boldenweck v. Bullis* (Colo.), 90 P. 634; *South-West Natural Gas Co. v. Fayette Fuel Gas Co.* (Pa.), 23 A. 224; *Clark v. American Coal Co.*, (Iowa), 53 N. W. 291; *Rankin et al. v. Southwestern Brewery & Ice Co. et al.*, (N. M.) 73 P. 614; *Mat-*

*thews* v. *Headley Chocolate Co.* (Md.), 100 A. 645; *Jepson* v. *Peterson* (S. D.), 10 N. W. 2d 749. See also *Davis* v. *Harrison* (Wash.), 167 P. 2d 1015.

There are many well considered cases in other state jurisdictions, which hold, in substance, as follows: "In the absence of special circumstances, a stockholder may sue in behalf of the corporation to avoid an improper transaction consummated at the expense of the corporation before he acquired his stock." *Pollitz* v. *Gould,* (N. Y.), 94 N. E. 1088. See the cases cited in the *Pollitz* case; *Just* v. *Idaho Canal & Improvement Co.* (Idaho), 102 P. 381; *Roberson* v. *Draney* (Utah), 178 P. 35; 13 Fletcher Cyclopedia of Corporations, Permanent Edition (1943 Revised Volume), Section 5980, note 51; Morawetz on Private Corporations, 2d ed., Sections 265, 266. For instructive discussions of such rule, see 4 Maryland Law Review 380; and annotation appearing in 148 A. L. R. 1090, *et seq.*

The records and opinions disclose that the question was incidentally present, but not passed upon by this Court in the cases of *Crumlish* v. *Railroad Co.*, 28 W. Va. 623, and *Deveny* v. *Coal Company,* 63 W. Va. 650, 60 S. E. 789. Otherwise this precise question is one of first impression in this jurisdiction, and we are free to follow either line of authorities.

*Pollitz* v. *Gould, supra,* is probably the leading case, although the rule therein stated has been altered in that jurisdiction by statute. General Corporation Law, §61, as amended by Laws 1944, c. 667. See *Noel Associates* v. *Merrill,* 53 N. Y. S. 2d 143. We think that the principle and reasoning in support thereof found in the *Pollitz* case are sound, and, accordingly, hold that a stockholder of a corporation may maintain a derivative suit for the benefit of the corporation, even though the alleged mismanagement, fraud, or misconduct occurred prior to the acquisition of stock by the complainant.

A person owning stock in a private corporation is entitled to his *pro rata* share of the property of the corporation, and it would be a contradiction in terms to say that

a corporation has the right of recovery against some of its stockholders, managers, officers and agents, but that such right is not properly exercised in a derivative stockholders' suit merely because complainant was not a stockholder at the time of the wrongdoing. The corporation is the primary beneficiary of a derivative suit, and the stockholder only secondarily benefited. Furthermore, we think it sound to say that all benefits of a stockholder in a corporation inure to the purchaser of the stock. Of course, where a stockholder buys stock in a corporation for the sole purpose of engaging in litigation, or is otherwise guilty of bad faith in the acquisition of such stock, or is actuated in the acquisition of stock by ulterior motives, his purchase would not uphold his right to sue. But such is not shown to be the case here. Therefore, we are of the opinion that the assignment of error relative to allowing no recovery to Elk Horn at the instance of the appellees, who acquired stock after the alleged misconduct of the receiver in selling the 98,000 certificates, is without merit.

We now come to a discussion of the defense of laches interposed by the appellants. If the relief prayed for by the appellees is barred by laches, discussion of the succeeding questions raised by the other assignments of error would also be needless. A definition of laches, approved by this Court, is as follows: "Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." *Harrison et al. v. Miller, Exec.*, 124 W. Va. 550, 21 S. E. 2d 674. Black's Law Dictionary, 3d ed., page 1062, is to the same general effect. The basis for the application of the doctrine of laches presupposes the want of diligence and activity by a party litigant, which has wrought a change of position by, or disadvantage to, his adversary. But a lack of activity and diligence does not affect the rights of a party, when such party had no knowledge of his rights, and knew no fact or facts putting him on inquiry. *Baker v. Schofield*, 243 U. S. 114, 37 S. Ct. 333, 61 L. ed. 626.

This Court has applied the doctrine of laches to different facts: *Williams et al v. Maxwell et al.*, 45 W. Va. 297,

31 S. E. 909; *Plant* v. *Humphries,* 66 W. Va. 88, 66 S. E. 94; *Middleton* v. *Bowyer,* 75 W. Va. 187, 83 S. E. 723. See also *Lewis* v. *Broun,* 36 W. Va. 1, 14 S. E. 444; *Boyce v. Montauk Gas Coal Co.,* 37 W. Va. 73, 16 S. E. 501; *Whittaker* v. *Southwestern Virginia Improvement Co.,* 34 W. Va. 217, 12 S. E. 507; *Lafferty* v. *Lafferty,* 42 W. Va. 783, 26 S. E. 262; *McMullin* v. *Matheney,* 104 W. Va. 317, 140 S. E. 10.

In view of the confidential relation admittedly existing between the appellants and the receivers, we think the following language is appropriate: " 'Where bills are filed to set aside contracts or deeds between parties standing in a confidential relation to each other, the defense of *laches* is not usually regarded with favor. It has been said that "length of time weighs less in such a case than in any other," and that it is "extremely difficult for a confidential agent to set up an available defense grounded on the *laches* of his employer" ' ". *Keenan* v. *Scott,* 64 W. Va. 137, 146, 61 S. E. 806. See *Curl* v. *Vance,* 116 W. Va. 419, 181 S. E. 412.

Do the facts with respect to the sales of certificates show an unreasonable delay or omission to act on the part of the appellees, or any waiver on their part of any of their rights as stockholders of Elk Horn? As hereinabove stated, none of the three purchases of certificates was made by Arthur B. Koontz or Patrick D. Koontz in their own names. The purchases from the receiver and the ancillary administrator of C. W. Watson were made in the name of H. D. Kinsey. The purchase from the domiciliary administrator was made by Frank Shaver. It is to be noted that the transfers of the certificates, in accordance with the provisions of the voting trust agreement, were required to be made on the books of the voting trustees. As heretofore shown, the records of the voting trustees disclose that no record transfers of the certificates were made from Kinsey and Shaver to appellants, and from that fact we infer that the stock transfer records of Elk Horn similarly would not disclose the real owners of the stock represented by said certificates.

The facts disclosed by this record amount to concealment by the appellants. The exact time the appellees were apprised that the appellants were, in fact, the purchasers is not shown by the record, nor is any fact shown therein which would put them on inquiry. We therefore perceive no ground or reason to apply the doctrine of laches to bar the relief sought by the appellees herein.

Furthermore, it is doubtful that any assignment of error specifically raises the question of laches. But in view of the vigorous assertions in the briefs of counsel relative to that doctrine, we have carefully and fully considered the same, and have arrived at the conclusion that there is no ground for barring relief because of laches.

Before discussing the three specific purchases by which appellants acquired their claimed ownership of the 98,000 certificates, it is apposite to discuss principles applying alike to all three purchases. The voluminous record and briefs in this suit present many and varied issues of law. There is little, if any, conflict in the material and controlling facts. Whether appellants were appointed as counsel for the receivers by the Circuit Court of Kanawha County, or whether they were employed by private negotiations with the receivers, we do not regard as material. Unquestionably, they acted under one or the other arrangement.

An attorney owes to his client the high duty to diligently, faithfully and legitimately perform every act necessary to protect, conserve and advance the interests of his client. No deviation from that duty can be permitted. That principle of conduct is a stern and inflexible rule controlling the relationship of attorney and client so long as the relation exists.

In all well established and accepted systems of jurisprudence, regulating the affairs of mankind, fiduciaries are required to conduct themselves according to the highest ethical and moral standards. No other rule can be tolerated or permitted.

The relation of director and stockholder partakes somewhat of the relations relating to commercial dealings.

Although directors may occupy a fiduciary capacity in some instances, such relationship is lacking in others. *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 23 L. ed. 328. In *Poole* v. *Camden,* 79 W. Va. 310, 92 S. E. 454, this Court said: "The relationship of a director to a stockholder in a corporation is not that of strict fiduciary capacity so as to preclude him as a matter of law from purchasing the shares of stock of such stockholder without incurring the penalty of having the sale set aside at the election of the stockholder, regardless of the facts and circumstances of the transaction." But if a director is requested to give information as to the corporation's property, its financial condition, and the plans and possibilities for future development thereof, he must fully and truthfully answer all such inquiries. If he fails to do so, he is guilty of fraud. *Poole* v. *Camden, supra.*

If an officer and a majority stockholder of a corporation sells its assets in effect to himself for an inadequate price, and in fraud of the rights of the minority stockholders, the sale will be set aside. *Tierney* v. *Coal Company,* 85 W. Va. 545, 102 S. E. 249. See *Mfg. Co.* v. *Lewis,* 105 W. Va. 102, 141 S. E. 529.

However, the relation of attorney and client is more confidential and on a higher plane than the relation existing between directors and stockholders of a corporation. This Court has said: "No closer or more confidential relation can exist in matters of business between parties than that of client and attorney; and while such relation exists an attorney cannot allow his personal interests, in any way, to become antagonistic to those of his client without at once giving the client full information thereof." *Roller* v. *McGraw,* 63 W. Va. 462, 60 S. E 410. See *Ralphsnyder* v. *Titus,* 74 W. Va. 204, 208, 82 S. E. 257. Thus it will be seen that cases involving the relationship between directors and stockholders of a corporation, when contrasted with those concerning attorney and client, are not applicable. Accordingly, we reject the contentions impliedly made herein that a director owes the same duties to stockholders that an attorney owes to his client.

Appellants rely on that part of the voting trust agreement hereinabove quoted with respect to allowing the trustees to become pecuniarily interested in matters connected with Elk Horn. It is unnecessary to discuss that contention at length. We dispose of it by saying that the relationship between the voting trustees and the corporation, as provided by the voting trust agreement, is an entirely different matter from the relationship sustained by the appellants as attorneys for the receivers.

We have carefully examined this record with reference to the tacit understanding or agreement between Pocahontas, on one part, and Watson and Arthur B. Koontz, on the other. We are of opinion that such tacit understanding or agreement is established by the evidence. But said agreement did not authorize appellants to violate their duty and assume a position antagonistic to their clients' interests. We think that such understanding or agreement tends to establish that appellants, in purchasing the 98,000 certificates, acted in good faith. That conclusion is further supported by the fact that the appellants probably paid an adequate consideration for the 98,000 certificates. Nevertheless, there was a concealment of the real purchasers' identity, and regardless of the tacit understanding, the payment of an adequate consideration, and the fact that the appellants acted in good faith, we do not think they can avoid the effect of well settled principles controlling and governing the relationship between attorney and client.

In the interest of clarity it is necessary to state that the 60,000 certificates, the 28,000 certificates, and the 10,000 certificates were not the trust property or *res*. As to the 60,000 certificates, the trust *res* or trust estate was the right of the receivers of Elk Horn, as pledgees, to resort to a sale to enforce the payment of debts due from the C. W. Watson estate to Elk Horn. The trust *res*, as to the 28,000 and 10,000 certificates, was the right of the receivers of Elk Horn, as creditors of an insolvent decedent, to resort to decedent's property for the payment of his debts.

We now come to a discussion of the sale of the 60,000

certificates. In the case of *Newcomb et al.* v. *Brooks et al.,* 16 W. Va. 32, this Court was evaluating and discussing the conduct of an attorney, who was a secret purchaser of a one-half interest in certain land at a commissioner's sale, the legal title to which was theretofore held by two trustees, clients of said attorney. It was there held: "A purchase by a fiduciary, while actually holding a fiduciary relation, of the trust property, either of himself or of a party to whom he holds such fiduciary relation, is voidable at the option of the party to whom he stands in such a relation, although the fiduciary may have given an adequate price for the property and gained no advantage whatever." See *Lane* v. *Black,* 21 W. Va. 617; *Winans* v. *Winans,* 22 W. Va. 678; and *Wade* v. *Pettibone,* 11 Ohio 57; 37 Am. Dec. 408. As to rights of a *cestui que* trust against his fiduciary, see *Reilly* v. *Oglebay,* 25 W. Va. 36; *Walker* v. *Ruffner,* 32 W. Va. 297, 9 S. E. 215.

Courts in other jurisdictions have applied strict rules of conduct in variant relations. See *Davoue* v. *Fannin,* (N. Y.) 2, Johnson 252; *Meinhard* v. *Salmon* (N. Y.), 164 N. E. 545; *Van Epps* v. *Van Epps* (N. Y. Chy.), 9 Paige 237; *Shanley's Estate* v. *Fidelity Union Trust Co.,* (N. J.), 157 A. 160; *People* v. *Central Republic Trust Co.* (Ill. App.), 20 N. E. 2d 999; *Tracy* v. *Willys Corporation,* 45 F. 2d 485; *Michoud et al.* v. *Girod et al.,* 45 U. S. 503, 11 L. ed. 1076; *Magruder* v. *Drury,* 235 U. S. 106, 35 S. Ct. 77, 59 L. ed. 151; *Jackson* v. *Smith,* 254 U. S. 586, 41 S. Ct. 200, 65 L. ed. 418.

It was incumbent upon the receivers herein to disclose the actual purchasers of the 60,000 certificates. *Phelan* v. *Middle States Oil Corporation,* 154 F. 2d 978. Even in those jurisdictions where the purchase of property of a client by an attorney was upheld, the attorney "must also show that he fully informed his client of all the material facts and gave the same disinterested advice he would have given had the sale been made to a stranger." *Watts* v. *Jackson* (Okla.), 182 P. 508. In the case at bar, the identity of the real purchasers was concealed, not only from other stockholders, but from the court on authority of which the receivers acted.

We do not mean to say that the appellants occupied the position of trustees of an express trust with respect to the 60,000 certificates, but they did occupy a high fiduciary relationship to that property. This rule of law, as heretofore stated, is founded on public policy and the requirements of high ethical and moral standards. Any deviation therefrom cannot be permitted or condoned in any way. It was the duty of the receivers of Elk Horn to see that the pledged certificates were sold for as high a price as possible; and it was likewise the duty of the appellants to assist the receivers in performing that duty. On the contrary, the appellants' interest in purchasing the 60,000 certificates was that they should be sold as cheaply as possible. The antagonism between the duties of the receivers and their counsel and the interests of the appellants, as purchasers, is obvious. Appellants, in purchasing the 60,000 certificates, placed themselves in such position that their efforts as attorneys for the primary receivers were defeated. The law will not permit such conduct on the part of an attorney; the temptation is too great.

Some courts have gone so far as to hold a sale of receivership property to an attorney for the receiver as void *ab initio*. 16 Fletcher Cyclopedia of Corporations, Permanent Edition, (1942 Revised Volume), Section 7877. However, in our opinion, although the sales and purchases are not void, they are voidable. Accordingly we hold that the appellees prosecuting this proceeding on behalf of Elk Horn could avoid the sales and purchases. In conformity with what has been said, the sale of the 60,000 certificates is set aside and held for naught, to the extent hereinafter stated, and the primary receivers of Elk Horn are restored to all rights which they had prior to the sale, as pledgees of said 60,000 certificates.

The sales of the 38,000 certificates were made by the ancillary and domiciliary administrators of the estate of C. W. Watson, and it is here contended that the same strict rule would not apply as that to the sale made by the receivers. There is a conflict of authority on this question. It is held by many courts that a sale to a trustee in a

proceeding brought about by a third party, which sale was not procured by the trustee and over which he had no control, is valid. See *Allen* v. *Gillette,* 127 U. S. 589, 32 L. ed. 271; *Steinbeck* v. *Bon Homme Mining Co.* (8 C. C. A.), 152 F. 333; *Fleming* v. *McCutcheon* (Minn.), 88 N. W. 433; *Swineford* v. *Virginia Trust Co.,* (Va.) 152 S. E. 350.

This Court has decided a question cognate to the one here discussed. *Brown* v. *McGraw,* 98 W. Va. 607, 128 S. E. 124. In the *Brown* case, McGraw was appointed administrator of a decedent; guardian of decedent's infant children; and was a creditor of decedent's estate. Among other properties of the decedent was a tract of land. The personal estate was insufficient to pay the debts, and McGraw instituted a chancery suit, one of the objects of which was to subject the real estate of the decedent to the payment of the indebtedness of the estate. The suit resulted in a sale of the land, at which sale, conducted by a special commissioner, McGraw became the purchaser. In a suit by the heirs of McGraw's decedent to set aside the sale so made, this Court held: "An administrator who is also a creditor of his decedent is not precluded from being the purchaser of real estate of a decedent made at a regular judicial sale at auction by a special commissioner, in a suit to sell the same to satisfy debts, the personal property being insufficient. If the sale be for an adequate price, at open competition, without suspicion of fraud or collusion, and the proceedings and sale be regularly conducted, reported and confirmed, the simple fact of purchase by the administrator will not render the deed voidable upon complaint of an heir of the decedent."

But the *Brown* case is distinguishable from the case at bar. In the instant case the record does not show that the appellants were creditors of Elk Horn, and although the sales of the 38,000 certificates may have been made for an adequate price, there is little showing that there was open competition. Both sales were private. Furthermore, the real purchasers were not reported and the sale confirmed as to them. We doubt whether the *Brown* case enunciates

a sound doctrine, being supported by the more liberal doctrine obtaining in the State of Pennsylvania, and by the line of cases following the holding in *Allen* v. *Gillette, supra,* which are contrary to the doctrine enunciated in *Newcomb, et al.* v. *Brooks, et al., supra.* We are not disposed to say that the doctrine of the *Brown* case should be further extended. At least that rule is inapplicable to the instant case, as has been shown.

In this case we agree with the following: "What possible difference can it make, in reason and principle, in what manner or by whom the sale is made of that which the trustee holds, when his duty in his trust relations is to make the property bring the highest price, in the protection of the interest of the *cestui que* trust? His duty remains the same; he stands concerned, for the time being, as would be the owner of the property in appreciating it. When he becomes the purchaser and exercises the conceded privilege of a purchaser to acquire at the lowest price, a direct conflict between fiduciary and personal interest arises." *Marshall* v. *Carson* (N. J. Eq.), 48 Am. Rep. 319, 323. See 3 Trusts & Trustees, Bogert, Section 486; *Miller* v. *Holcombe's Exc'r., et al.,* 9 Gratt. 665; *Pearson* v. *Pearson* (N. C.), 40 S. E. 2d 477; *Gaffney* v. *Jones* (Wash.), 51 P. 461.

Neither Elk Horn, nor its receivers, had any right as pledgees of said 38,000 certificates, but the receivers did have the right to subject said certificates to the payment of the debts due Elk Horn from the estate of C. W. Watson. In purchasing such certificates the appellants placed themselves in an antagonistic position. It was their duty to assist in the collection of all debts due from the estate of C. W. Watson to the primary receivers of Elk Horn. But when they purchased from the ancillary and domiciliary administrators, it was to their personal interest to cause the certificates to bring a low price.

We think the case of *Feamster* v. *Feamster,* 35 W. Va. 1, 13 S. E. 53, is authority for the proposition that even though the sale was made by a third party and the fiduciary did not control the sale, the same should be set aside.

Therefore, we are of opinion, and so hold, that the sales of 28,000 certificates and 10,000 certificates, respectively, made by the ancillary and domiciliary administrators of C. W. Watson to the appellants are voidable at the suit of the appellees. Accordingly, said sales are hereby set aside and held for naught, to the extent hereinafter stated. The primary receivers are restored to the same rights they had prior to the sales, namely, the right of a creditor to resort to the property of a deceased insolvent debtor for the satisfaction of debts.

The decree of the lower court impressed the 98,000 certificates with a trust in favor of the "receivership estate" of Elk Horn. We think that part of the decree is erroneous. To impress the 98,000 certificates with a trust, would be to give the receivers and Elk Horn an advantage and priority to which they are not entitled in law or in equity.

The primary receivers of Elk Horn occupy the position of a limited pledgee as to 40,000 of the 60,000 certificates; that is to say, said 40,000 certificates were pledged only to secure the payment of the $4,000.00 note given to Elk Horn as the purchase price thereof. As to the remaining 20,000 certificates pledged to Elk Horn, the primary receivers are unlimited pledgees, in that they could not only resort to the 20,000 certificates for payment of the $2,000.00 note, but could also enforce the payment of other debts owed by the estate of C. W. Watson to Elk Horn. As to the 38,000 certificates, Elk Horn occupied the position of a creditor of the estate of C. W. Watson, having the right given to Elk Horn, as well as to all other creditors of decedent, under the laws of this jurisdiction. All of those rights are hereby restored to the receivers of Elk Horn, but Elk Horn should not be given the favored position of a *cestui que* trust by the decree. In that respect the decree is reversed.

Nor do we attempt herein to impress the 98,000 certificates with an equitable lien in favor of Elk Horn and its receivers. By our holding herein we merely avoid the

three sales of certificates to the extent that said sales have any effect upon the rights and remedies of Elk Horn and its receivers to look to the said certificates for the collection of its debts due from the C. W. Watson estate. The parties to this proceeding are restored to all rights they had prior to the said sales. However, only to that extent are said sales hereby invalidated and avoided. With respect to the certificates, we are here concerned only with the rights of Elk Horn and its receivers, on the one hand, and the present holder of the certificates, Arthur B. Koontz, in his own right and as administrator, c.t.a., of the estate of Patrick D. Koontz, on the other hand. We can perceive, from briefs filed herein by various *amici curiae*, that possibly there may be other persons who may claim to have rights in and to the said certificates. If such persons exist, their claims to the certificates are not before us now for adjudication, and we express no opinion as to the rights of such claimants. We have determined herein only that said sales may be, and are, avoided to the extent of the rights of Elk Horn and its receivers with respect to the certificates.

The appellants and appellees contend, however, that in so holding, this Court, in effect, is denying full faith and credit to the order of the Probate Court of Hamilton County, Ohio, which approved the sale of the 28,000 certificates to H. D. Kinsey. Obviously, the principal question presented to said Probate Court of Hamilton County, Ohio, was the adequacy of the purchase price, which said court approved. As hereinbefore stated, we likewise think the consideration for the 28,000 certificates was adequate. In that respect, the decision of this Court accords full faith and credit to the conclusion reached in that proceeding. But in the instant case we are concerned with questions of public policy, on which the aforesaid probate court made no adjudication. The propriety of the sale to H. D. Kinsey could not be questioned had he been the actual purchaser; but only in the instant suit was it disclosed that the actual purchasers were the Koontzes who had theretofore concealed the fact that Kinsey was their agent.

Furthermore, all the certificates are now within the jurisdiction of the courts of West Virginia, and certain rival claimants to said certificates are parties to this suit. Therefore, the courts of this State have jurisdiction of the 28,000 certificates sufficient to decree that said certificates be subjected to the rights of Elk Horn. See *State* v. *Fredlock,* 52 W. Va. 232, 43 S. E. 153; *Woodcock* v. *Barrick,* 79 W. Va. 449, 458, 91 S. E. 396; and *Toro* v. *Shilling,* 108 W. Va. 612, 152 S. E. 6.

The decree of the trial court provides that 98,000 shares of common stock shall be issued by Elk Horn and delivered to the receivers for sale by two special commissioners. We do not think there is now any reason for the issuance of such stock. When the sales to the appellants were made, they were sales of certificates and not of common stock of Elk Horn. The original rights of the primary receivers being restored to them, the issuance of common stock is unnecessary. Therefore, the decree of the trial court, in so far as it requires the issuance of common stock, is reversed.

A majority of this Court approves the sale by special commissioners of as many of the certificates as is necessary fully to satisfy the said debts, with interest, of Elk Horn and its receivers. Accordingly, that portion of the decree of the trial court appointing special commissioners for the purpose of making sale of the certificates is affirmed, though the purposes and extent of such sale or sales are modified as hereinabove stated. The writer of this opinion states that in his judgment, though in the minority in this respect, he would require that the 60,000 certificates be sold by the receivers so as to assist in the conservation of the receivership estate, permitting special commissioners to sell only the 38,000 certificates.

It is contended by appellants that the rights of persons to the proceeds of the sales should have been adjudicated. Since we hold that the sales shall be limited to the extent of the said claims, with interest, of Elk Horn and its receivers, no further discussion of that contention is necessary.

Appellants complain that the trial court adjudicated that they should account for the securities purchased from the ancillary administrator other than the 28,000 certificates. The decree does not require appellants to account for such certificates, and no further consideration will be given thereto in this opinion.

The appellees, having substantially prevailed, are awarded their costs in the trial court, as well as in this Court, relating to this proceeding only. But the other costs of the receivership suit shall not be included.

Any allowance made to appellees' counsel for their services shall be paid from the amount of recovery received by Elk Horn or its receivers, as the result of any sales of the certificates in the manner hereinbefore set forth.

Out of the proceeds of any sales held in the manner above stated, the appellants shall be refunded on a *pro rata* basis, the amounts paid by them as the purchase price of the 98,000 certificates. Appellants shall also be allowed interest from the respective dates they paid said amounts to the receivers and the ancillary and domiciliary administrators until paid.

Accordingly, we reverse the decree of the trial court in so far as it requires (1) the impressment of a trust in favor of the receivership of Elk Horn; (2) sets aside the three sales for all purposes; and (3) orders the sale of reissued common stock. In so far as the decree of the trial court requires the reimbursement of Arthur B. Koontz, in his own right and as administrator, c.t.a., of Patrick D. Koontz, for amounts expended in making the purchases of the certificates, the same is modified in the manner herein stated and, as modified, is affirmed. In all other respects the said decree is affirmed.

This cause is remanded to the trial court with directions to enter a decree in accordance with this opinion; and to permit such other and further proceedings consistent with this opinion as are necessary to effectuate the payment of the debts, with interest, due the receivers of Elk Horn, or the corporation, itself, from the estate of C. W. Watson.

*Affirmed in part; reversed in part; modified; and remanded with directions.*