BANK OF MILL CREEK

*v.*

THE ELK HORN COAL CORP., *et al.*
*and*
HARRY W. ALLERS, *et al.*

*v.*

THE ELK HORN COAL CORP., *et al.*

(No. 10331)

Submitted April 24, 1951.          Decided June 5, 1951.

*Robert S. Spilman* and *Rummel, Blagg & Stone,* for appellant.

*Jackson, Kelly, Morrison & Moxley, Thomas B. Jackson, W. Goodrich Sale, Jr.,* and *David D. Johnson, Crisona Brothers, James J. Crisona,* for appellees.

Fox, PRESIDENT:

This appeal is the aftermath of a decision rendered in these causes on February 14, 1950, reported in 133 W. Va. 639, 57 S. E. 2d 736, and pertains generally to the character of the decree which the lower court should have entered in carrying out the mandate of this Court based on that decision. At the cost of considerable repetition of matters stated in said decision, it will be necessary to trace certain transactions between The Elk Horn Coal Corporation, Clarence W. Watson and Arthur B. Koontz, individually and as personal representative of Patrick D. Koontz, deceased, who will be hereafter referred to in this opinion as "Elk Horn", "Watson" and "Koontz".

Following the decision of February 14, 1950, the causes were remanded to the Circuit Court of Ohio County for the entry of a proper decree based upon that decision. After the remand, and prior to the decree entered, there were filed in the causes the petition of Sam G. Polino Company, a corporation, and the joint petition of James E. Watson, III, and W. H. Toothman, as committees, asserting certain claims against the estate of C. W. Watson, deceased, and particularly asserting such claims against the same property on which Elk Horn bases its claim. Separate objections to the filing of the said petitions were entered by Elk Horn and Koontz, and their separate demurrers were interposed thereto. There has been no ruling on such demurrers, and the petitions filed were not permitted to operate to delay the entry of the final decree as to the claim of Elk Horn against the Watson estate, the result of all of which was that on July 6, 1950, the said circuit court entered the decree complained of, and on October 2, 1950, at the instance of Koontz, we granted this appeal.

The Elk Horn Coal Corporation is the successor of Elk Horn Coal Corporation, which was organized about the year 1915. The orignal company acquired in excess of 150,000 acres of coal, with some surface, located in the State of Kentucky, and from the beginning C. W. Watson appears to have been the ruling spirit in the organization. In 1931, Elk Horn Coal Corporation was placed in the hands of a receiver in a suit prosecuted in Letcher County, Kentucky; and in 1935, said company was adjudged bankrupt in the United States District Court for the Southern District of Ohio, Western Division, and the said Watson was appointed its trustee. In the year 1937, a plan of reorganization, under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, was adopted and approved and from that proceeding emerged, in February, 1937, the present corporation under the name of "The Elk Horn Coal Corporation".

C. W. Watson became president of the reorganized corporation, The Elk Horn Coal Corporation, at a salary of

$18,000.00 per annum. At that time, Watson was indebted to the corporation, as reorganized, in a sum then fixed at $219,000.00, and under his contract of employment that indebtedness was to be reduced by Elk Horn in the sum of $3,333.00 per month so long as he continued his employment as president. He continued that employment until his death, and applying the agreed monthly reduction, the amount due from Watson to Elk Horn at the date of his death, on May 24, 1940, was approximately $85,825.50. At the time of the reorganization of Elk Horn, in 1937, it was agreed by Elk Horn that as a further consideration for Watson's employment, he be given Voting Trust Certificates, hereinafter referred to as "certificates", representing 40,000 shares of the corporation's common stock and certain options to purchase stock, which will be hereafter referred to. These 40,000 certificates include the 38,000 certificates owned by Watson at the time of his death, 28,000 of which were held by him in the State of Ohio, and there administered as a part of his estate, and 10,000 shares which were held by him in West Virginia, and administered in this State by his personal representative. By this same agreement, dated June 10, 1937, Elk Horn granted to Watson the right at any time during the calendar year of 1938 to purchase all or any part of 20,000 additional certificates of the common stock of Elk Horn at ten cents per share, and the right, in 1939, 1940 and 1941, to purchase further certificates, representing all or any part of 40,000 shares of such common stock at the same price. Under this option, Watson, on December 29, 1938, purchased 20,000 shares of certificates of the common stock of The Elk Horn Coal Corporation for the sum of $2,000.00, and in payment therefor executed his note, dated December 29, 1938, and payable to The Elk Horn Coal Corporation on demand after sixty days notice, with interest at three per cent per annum, and deposited as collateral security "for payment of this or any other liability or liabilities of ........ to said ........ due or to become due, or that may be hereafter contracted, the following property, viz; 20,000 shares Voting Trust Certificates of Common Stock of The Elk Horn Coal Corporation." The only in-

debtedness of Watson to Elk Horn, other than the $2,000.00 note then executed, was the balance due on the $219,000.00 obligation aforesaid. On December 16, 1939, Watson exercised his option to purchase 40,000 certificates, in payment for which he executed his note bearing the same date, payable to Elk Horn on demand after sixty days notice, the sum of $4,000.00, with interest at three per cent per annum, and pledged the said 40,000 certificates as collateral surety for the payment of said note, the pledge not covering any indebtedness other than the $4,000.00 for which the note was given. Both of these collateral notes contained the usual provision for the sale by the pledgee in case of default in the payment thereof.

As stated above, Watson died on the 24th day of May, 1940, owning 98,000 certificates which entitled him to that number of shares of the common stock of Elk Horn, 60,000 of which certificates were pledged as collateral for indebtedness to Elk Horn, as indicated above, and 38,000 of which certificates were unpledged. Watson, in effect, died intestate, although he had executed a will by which he devised his estate to his sister, Lucy Watson, and appointed her as executrix of his will. She preceded him in death, and Ernest Hutton was appointed administrator of his estate, and into his hands the 10,000 certificates passed. An ancillary administrator was appointed in the State of Ohio, and 28,000 certificates, along with other securities owned by Watson, passed into his hands, and were adminstered in that state. While Watson held the legal title to the 60,000 certificates pledged with Elk Horn as collateral, Elk Horn retained the possession of said certificates.

In this connection, it is well to state that the pledging of the 60,000 certificates to Elk Horn did not affect Watson's title to such shares. The title to said shares remained in Watson, subject, of course, to his pledge. We find this proposition of law clearly stated in *Bank* v. *Harkness*, 42 W. Va. 156, 24 S. E. 548, in which this Court, in the body of the opinion, quotes with approval the following statement from Jones, Chat. Mort. § 4:

" 'The chief distinction between a mortgage and a pledge is that by a mortgage the general title is transferred to the mortgagee, subject to be revested by the performance of the conditon; while by a pledge the pledgor retains the general title himself, and parts with the possession for a special purpose.'

And the same author in his work on Pledges (section 7) says:

'A pledge differs from a mortgage of personal property in being a lien upon property, and not a legal title to it. The legal title to the property pledged remains in the pledgor, while a mortgage passes the legal title of the property itself to the mortgagee, subject to be revested in the mortgagor upon the performance by him of an express condition subsequent.' "

On this subject, see 41 Am. Jur. 603, in which it is stated:

"By the contract of pledge, the pledgeor does not part with his general right of property in the collateral. The general property therein remains in him; only a special property vests in the pledgee. The pledgee does not acquire an interest in the property except as a security for his debt. * * *"

It is fundamental law that Watson, having died possessed of these 98,000 certificates, they constituted assets in the hands of his personal representative for the payment of all of his indebtedness to be paid ratably, unless perchance in his lifetime liens had been created on the property by having pledged the same as collateral security, or liens had been created by mortgage deeds of trust, or judgments and levies of execution, or statutory provisions giving certain preferences. As to the personal property involved in these causes, the only liens which would affect the right of general creditors would be the collateral liens created by the pledge of the 60,000 certificates as described above.

This being the situation at the date of Watson's death, there could be no subsequent change in the status of creditors of his estate. On the death of any man, his

assets are frozen for the purpose of the payment of his debts, and the partiton and distribution of his estate. Of course, persons holding special liens are not precluded by his death from exercising such rights as they possess, unless restricted by the action of some court of competent jurisdiction.

Shortly after Watson's death, the affairs of Elk Horn being in confusion, the Bank of Mill Creek instituted its suit against Elk Horn, and others, in the Circuit Court of Kanawha County, West Virginia, praying for the appointment of receivers, and, in effect, for the liquidation of the said corporation and its assets and W. W. Goldsmith and Howard N. Eavenson were appointed and qualified as receivers. An ancillary proceeding in Letcher County, Kentucky, followed, and Goldsmith, Eavenson and one J. J. Moore were appointed ancillary receivers in the State of Kentucky. Moore was afterwards succeeded by Thomas Haymond. The firm of Koontz & Koontz, consisting of Arthur B. Koontz and Patrick D. Koontz, with whom W. W. Goldsmith was associated, was employed as counsel for the primary receivers, and has continued to act as such, and was so acting in December, 1941.

In December, 1941, the receivers for Elk Horn exercised their right to sell the 60,000 certificates held by them as collateral, and to effect that purpose obtained an order in the Circuit Court of Kanawha County authorizing them to make such sale. The sale was made, after due notice, on December 20, 1941, and the 60,000 certificates were purchased by one H. D. Kinsey, who admittedly represented Koontz, at the price of $7,500.00. The sale was made at public auction, and was duly confirmed by the court which authorized it. There has never been any attack by Elk Horn upon the regularity of the sale, so far as concerns the purchase price, or the methods by which the sale was effected, other than the contention that Koontz, considering his relation to Elk Horn as counsel for its receivers, was not in a position to become a purchaser of said certificates.

After the sale of the 60,000 certificates to Koontz, there remained 28,000 of such certificates in the hands of the ancillary adminstrator in the State of Ohio. That administrator had in his possession certain other securities of Watson, and, on May 17, 1944, a private sale was conducted by him in Ohio in which H. D. Kinsey, acting for Koontz, purchased various securities belonging to Watson's Ohio estate for the sum of $22,500.50, plus a fee for collection of $25.32, a sale confirmed by the proper authorities in the State of Ohio. This sale included the 28,000 certificates entitling purchasers to that number of common shares of Elk Horn. It seems to be admitted that the cost to Koontz of the 28,000 certificates was $5,508.50, this amount being reached by deducting the amount received from other securites purchased at that time from the entire purchase price. This last-mentioned sale left the Watson estate the owners of 10,000 Elk Horn certificates in the hands of the West Virginia administrator, and, on May 22, 1944, Ernest Hutton, the West Virginia administrator, sold at private sale the said 10,000 certificates to Frank Shaver for the sum of $2,000.00. Admittedly, Shaver was acting for Koontz. The effect of all of these sales was to vest in Koontz apparent ownership of all of the 98,000 certificates of which Watson died possessed.

Prior to Watson's death, a number of judgments had been obtained against him in the Circuit Court of Marion County, West Virginia, and it appears that these judgments, and it may be other claims, were presented to the ancillary administrator in Ohio to the amount of approximately $163,663.00. The receivers of Elk Horn, in May, 1944, subsequent to the death of Watson, and subsequent to the sale of the 60,000 certificates to the agent of Koontz in December, 1941, purchased such claims so presented against the Ohio assets for the sum of $850.00; and also in May, 1944, purchased for the sum of $700.00 approximately $140,000.00 in claims against Watson's estate in West Virginia, the West Virginia claims being a part of the same claims presented in the State of Ohio. The purpose of the receivers of Elk Horn in purchasing these claims against

the Watson estate was probably due to the impression that in some way they might obtain the benefit of the collateral agreement for which the 60,000 certificates had been pledged with them. If they had such an idea, they had evidently failed to take into consideration the fact that at the time they made the purchase of the claims against the Watson estate in Ohio and West Virginia, Elk Horn had, except as noted in former opinion, parted with all of its rights in the 60,000 certificates. By its election, it had chosen to sell such certificates and received the proceeds of such sale. Furthermore, they evidently did not take into consideration the fact that, after the death of Watson, no preference could be obtained as between creditors of his estate, their rights being fixed and determined as of the date of his death.

This was the situation when the second of these causes was instituted on February 4, 1946. Harry W. Allers, and others, representing various owners of different types of stock in Elk Horn, filed their petition in the original suit of Bank of Mill Creek against Elk Horn, instituted in 1940, as aforesaid, the general purpose of which was to bring about an end to the receivership of Elk Horn, but which contained an attack upon the sale of the 60,000 certificates made to the agent of Koontz in December, 1941, as well as the sales of the 38,000 certificates made in May, 1944. We will not go into the details of that litigation because the same are set out at length in the decision of February 14, 1950, aforesaid. Suffice to say there was a final decree in the causes on February 20, 1948, entered by the Circuit Court of Ohio County to which court the causes had been transferred, and from which decree we granted an appeal. By our decision on that appeal we held, in effect, that Koontz was not in a position to purchase any of the certificates so purchased by him, and set aside all of the said sales, in so far as they affected the rights of Elk Horn to collect its indebtedness against Watson from said certificates, and remanded the causes to the Circuit Court of Ohio County. The contention of Allers and his associates that the sale of all of said certificates should be set aside

in toto, and said certificates held as a trust for the benefit of Elk Horn, was rejected. The effect of our holding was that if the debts due from Watson to Elk Horn, as of the date of any sale under attack, be paid, title to the certificates purchased would be firmly vested in the purchaser, so far as concerned Elk Horn. Provision was made for the sale of the certificates by special commissioners to be appointed by the Circuit Court of Ohio County. We gave full faith and credit to the proceeding in the State of Ohio by which the 28,000 certificates were disposed of in that state, subject, of course, to the general holding that Koontz was not in a position to become a purchaser. All of the sales were treated as voidable, and general provisions were made for the disposition of the certificates necessary to the protection of Elk Horn, including authority to sell all the certificates involved, and without distinction as between the 60,000 and the 38,000 certificates. Nothing was said in the opinion with reference to other creditors of Watson, although the existence of such other creditors was impliedly recognized.

In this state of the causes, the case went back to the Circuit Court of Ohio County, and hearings were held as to the form of the decree to be entered. During the course of this hearing, Polino, James E. Watson, III and Toothman filed petitions in the interest of creditors and beneficiaries of Watson, other than Elk Horn, and, as stated above, their petitions were filed, objections made thereto, and demurrers interposed, on which the court did not rule. Koontz filed a petition in the case asking the right to pay to Elk Horn the sum of $113,644.07 for the release of the 60,000 certificates he purchased on December 20, 1941, and the optional right to have released to him the 38,000 certificates acquired from the Ohio and West Virginia administrators of Watson on which no pledge had been made to Elk Horn or to any other person, upon the payment of the balance of the indebtedness of the Watson estate to Elk Horn. On the other hand, Allers and his associates contended that so many of the 98,000 certificates as were necessary to pay the full indebtedness of Watson

to Elk Horn, including the debts which the Elk Horn receivers purchased from Watson's creditors, subsequent to Watson's death, and subsequent to the sale of the 60,000 certificates in December, 1920, should be sold. At that time such total indebtedness to Elk Horn aggregated the sum of approximately $365,964.31. The effect of these two contentions was that Koontz claimed the right to redeem the 60,000 certificates by the payment of approximately $113,644.07 which would leave Elk Horn and other Watson creditors the right to liquidate their indebtedness out of the 38,000 certificates remaining which were never at any time pledged as collateral. The contention of Koontz seems to be based upon the proposition that by the decision of February 14, 1950, this Court upheld the sale of the 60,000 certificates made on December 20, 1941, except only as to the indebtedness of Watson to Elk Horn at that time, which indebtedness consisted of the two notes of $2,000.00 and $4,000.00, and the balance due on the $219,-000.00 Watson indebtedness to Elk Horn which has been reduced to approximately $85,000.00 at the date of Watson's death. No question is raised as to the correctness of the amount proposed to be paid by Koontz to Elk Horn, as to the indebtedness of Watson to Elk Horn at the date of the sale to Koontz in December, 1941, or the calculation of interest from that date.

The Circuit Court of Ohio County followed in general the contention of Allers and his associates, in respect to the character of the decree that should be entered, and, on July 6, 1950, entered a final decree, from which it is necessary to quote at large. The case was brought on upon the mandate of this Court, and the presence of counsel for the Bank of Mill Creek, Elk Horn, Allers, and others, counsel for Koontz, and for James E. Watson, III and Toothman, and Sam Polino & Company, the latter two being common creditors is shown. The court then proceeded to decree as follows:

"And upon consideration thereof, and in pursuance of said mandate, it is now adjudged, ordered and decreed that the said decree of this

court heretofore entered herein on the 20th day of February, 1948, be and the same is now hereby set aside and annulled in the following respects and to the following extent:

"(a) In so far as said decree would impress a trust, for the benefit of The Elk Horn Coal Corporation, or its receivers, upon the 98,000 voting trust certificates purchased by or for Arthur B. Koontz and Patrick D. Koontz, or any part thereof.

"(b) In so far as said decree would set aside for all purposes the three several purchases of voting trust certificates of 60,000, 28,000 and 10,000 certificates, respectively, by or for said Arthur B. Koontz and Patrick D. Koontz.

"(c) In so far as said decree requires the issuance of 98000 shares of common stock of The Elk Horn Coal Corporation in lieu of that number of voting trust certificates, the delivery thereof to the receivers of said corporation and the sale of such shares of common stock.

"It is further likewise adjudged, ordered and decreed that said decree of February 20, 1948, be now modified, amended and corrected in the following respects, and to the following extent:

"(1) Instead of setting aside and annulling in all respects the separate sales of voting trust certificates to or for said Arthur B. Koontz and Patrick D. Koontz, it is now adjudged, ordered and decreed that said sales and each of them shall be, and are hereby set aside in so far only as they may affect the rights of The Elk Horn Coal Corporation, or its receivers, to resort to said certificates for the collection of the debts due them from the Estate of C. W. Watson, as hereinafter decreed.

"(2) Instead of providing for the sale of all of said 98,000 voting trust certificates, as provided in said decree, it is now adjudged, ordered and decreed that only as many of said 98,000 voting trust certificates as is necessary fully to satisfy said debts shall be sold, as hereinafter provided."

Then follows some direction with respect to the reimbursement to Koontz of any sums paid to him in the purchase of any stock sold, after which the court further decreed:

> "And the court now proceeding to ascertain the amount for the collection of which The Elk Horn Coal Corporation and its receivers were and are entitled to resort to said 98,000 voting trust certificates, doth accordingly find, and so adjudge, order and decree as follows:

> "I. The debts of the Estate of Clarence W. Watson which The Elk Horn Coal Corporation and its receivers, Howard N. Eavenson and W. W. Goldsmith, are entitled to recover by sales of voting trust certificates as herein decreed, amount to the principal sum of $236,533.52, with interest thereon to the date of this decree in the sum of $129,430.79, (being interest on $234,973.93 at 6% per annum and on $1559.59 at 3% per annum to June 30, 1950) constituting an indebtedness as aforesaid in the aggregate sum of $365,964.31 as of the date of this decree.

> "II. Said The Elk Horn Coal Corporation and its said receivers, Howard N. Eavenson and W. W. Goldsmith, shall recover out of the proceeds of sale of voting trust certificates, as hereinafter provided, the aforesaid sum of $365,964.31, with interest thereon at the rate of six per cent per annum from the date of this decree until paid."

The decree then goes on to include necessary provisions for effecting the sale, goes into detail as to the manner thereof, and finally provides that upon the confirmation of the sale of such certificates as are actually sold by special commissioners appointed to make the sale, and Thomas B. Jackson and R. S. Spilman were directed to sell as many of the 98,000 certificates as might be necessary to pay the costs of said sale, including a commission to the special commissioners of five per cent, and to pay to Elk Horn the sum of $365,964.31, with interest, and to Koontz any sums to which he might be entitled as refund, and that the balance remaining should be paid to

Arthur B. Koontz in his own right and as administrator c.t.a. of the estate of Patrick D. Koontz, deceased, unless otherwise ordered by the court.

It will be noted that the decree entered operates as a preference in favor of Elk Horn as against other creditors of the Watson estate, whose claims were before the court at the time it was entered. It can only be assumed that the court below considered that in some manner Elk Horn had obtained such preference by reason of holding the 60,000 certificates as collateral, and that such collateral operated to secure Watson's indebtedness by Elk Horn as of his death. There can be no other basis for such a decree, and even if that could be defended, it can only apply to the 20,000 certificates pledged as security for the $2,000.00 note executed in December, 1938, and other debts, because the 40,000 certificates deposited as collateral only went to secure the note of $4,000.00 dated in December, 1939.

We are presented with two questions. The first is whether Koontz is entitled to have released to him, as against any claim of Elk Horn, the 60,000 certificates purchased by him in December, 1941, upon the payment of all indebtedness of Watson to Elk Horn, existing at the date of such sale, with interest to the date of any decree which may be entered in this case. The other question which we must meet and decide is the right of Elk Horn as a common creditor of the estate of Watson, and whether that right is confined to the 38,000 certificates unpledged, and of which Watson died possessed at the date of his death, and which at that time constituted assets in the hands of his personal representative for the payment of all of his debts without preference, except such as might have been obtained on account of liens which had attached to said estate in Watson's lifetime. We will discuss these two questions in the order stated.

As to the 60,000 certificates, sold in December, 1941, we are dealing in this opinion with the rights of Elk Horn on the one hand and Koontz on the other. As between these

parties, we think our opinion of February 14, 1950, in effect, sustained the sale of the 60,000 certificates to Koontz, except in so far as such sale prejudiced the rights of Elk Horn as to the payment of the full amount of the debt of Watson to Elk Horn, existing at the date of such sale. That decree was based upon the theory that Koontz was not in a position to purchase such certificates on any terms which in any way prejudiced the interest of Elk Horn. At that time the debt of Watson to Elk Horn, including the two notes of $2,000.00 and $4,000.00, was approximately $91,000.00. Any purchaser of the stock, other than Koontz, would have acquired good title to the certificates at the price which Koontz bid therefor. The reason Koontz could not acquire good title to said certificates at the price he bid therefor, through his agent, was that his relation to Elk Horn, through its receivers, was such that it did violence to public policy for him to bid or purchase to the prejudice of one toward whom he sustained a fiduciary relation. The decision we made, on February 14, 1950, merely set aside the sale to the extent that Elk Horn was prejudiced thereby. We think that if that prejudice is removed by Koontz, our decision must be understood to mean that Koontz may be decreed title to the certificates as against any claim which Elk Horn may attempt to assert against the same. It follows from this holding that the Circuit Court of Ohio County should have permitted Koontz to pay the sum offered to be paid by him in his petition for the release of the 60,000 certificates purchased by him in December, 1941, and release the said certificates from any claims on the part of Elk Horn.

We think this payment should be permitted and the release of these certificates effected, because, as a practical matter, it would serve no useful purpose to now require a sale of these certificates. Under our former decision, if Koontz had bid the full amount of Watson's indebtedness to Elk Horn, at the date of the sale of December 20, 1941, there could be no question as to the validity of the sale to him. The sale being attacked be-

cause it was contended that it was prejudicial to the rights of Elk Horn, because the sale price did not cover its then existing indebtedness, we held that the sale to Koontz was invalid on account of his relation to Elk Horn and its receivers, but it was set aside only to the extent that it prejudiced Elk Horn. That prejudice may be removed by the payment of the full indebtedness of Watson to Elk Horn at the date of the sale of the 60,000 certificates. Our decision placed Koontz in a position where, like all other people charged with a duty or obligation, he may purge himself therefrom by paying the sum of money, or performing the act, required to bring about an equitable adjustment of the matter in dispute. His offer to pay, though belated, and after this Court had made it imperative that he do so if he desired to retain the benefit of his purchase, can still be made under our former decision. That decision did not deal with this question because it was not raised, and perhaps not contemplated at that time. At that time, it was assumed that the certificates would be sold, or at least sufficient of them to meet the obligation of Watson to Elk Horn. The policy of the law has always been to avoid a sale of property by payment of a money decree from which the necessity for a sale arises. By permitting Koontz to make Elk Horn whole as to all indebtedness from Watson to it, at the date of the 1941 sale to Koontz, Elk Horn has no further reason to complain, and can no longer assert any claim of any character against the 60,000 certificates so sold at its instance.

The matter is not quite so simple as it affects the rights of creditors of Watson, other than Elk Horn, to attack the sale of the 60,000 certificates. As indicated above, those certificates were the property of Watson at the date of his death, and constituted assets for the payment of all of his debts. What effect the sale of said certificates had upon the rights of such creditors, and whether they have any rights that can be asserted in this cause, is perhaps a question depending upon whether Koontz owed any duty or obligation to the estate of Watson or to his

creditors, other than Elk Horn. On these questions, the Court expresses no opinion because the matter is not properly before us. This paragraph is only inserted in this opinion for the purpose of making clear, what we think appears throughout this opinion, that in permitting Koontz to obtain a release of the 60,000 certificates against all claims of Elk Horn and its receivers, we do not mean to foreclose any rights which the creditors of Watson, other than Elk Horn, may have as against the 60,000 certificates purchased by Koontz. Elk Horn, and its receivers, having elected to bring about a sale of such certificates, are not entitled to make a second claim against them.

As to the second question, we think it must be obvious that a decree which commingles the 60,000 certificates pledged as collateral, with the 38,000 certificates not pledged, coupled with the further fact that any claim of Elk Horn as to the 38,000 certificates, other than their claim as a common creditor of Watson, must be based upon transactions occurring after Watson's death, and which to afford Elk Horn any relief, beyond that to which all of Watson's common creditors are entitled, would be to create a preference in favor of Elk Horn, simply cannot stand in a court of equity. At the date of the sale in December, 1941, to Koontz, Elk Horn was not the owner of the indebtedness it acquired from some of Watson's other creditors. When, in 1944, the receivers of Elk Horn acquired this other Watson indebtedness, it amounted to approximately $163,000.00, represented by judgments which had been taken against Watson in his lifetime, they acquired no rights other than the rights which their assignors possessed at the time said judgments were assigned by the respective owners. They acquired no right under the collateral agreement under which the 20,000 certificates were deposited in 1938, and which contained the provision that the collateral covered subsequent indebtedness. Of necessity, that provision could not extend beyond the death of Watson, because, as has been stated, when Watson died his estate became frozen for the benefit of his creditors according to their respective situations

as they existed at that time. A creditor of Watson, holding shares of stock or other collateral of great value, to secure a comparatively small debt could not, after the death of the debtor, purchase other indebtedness of the decedent and use his collateral to cover such purchased indebtedness. To permit this would be to allow creditors to obtain preference in the distribution of an estate of a decedent which neither equity nor our statutes permit. Clearly, as to the 38,000 certificates of which Watson died possessed, the claim of Elk Horn is that of a common creditor, and it must share equally with other common creditors. The record before us discloses that there are other creditors, because the petitions filed in this case disclose that fact. Whether their claims can be maintained is a question not before us, but the fact remains that those claims are asserted and brought to the notice of the court below, and in no way disposed of. The decree which the lower court entered puts into effect a preference in favor of Elk Horn as against Watson's other creditors.

The question of the rights of common creditors of Watson, other than Elk Horn, is not before the Court. The decree which we think should be entered will permit Koontz to obtain a release of the 60,000 certificates on payment of the sum offered, which, naturally, will be increased by interest to the date of any future decree, and will end all claims of Elk Horn to the 60,000 certificates, but will leave to it its rights, along with other creditors, in the 38,000 certificates which should be sold and the proceeds applied to the payment of all common creditors of Watson. It will not be contended, we assume, that as between Elk Horn and Watson's other creditors, there can be any preference obtained after the death of the debtor, in this case Watson. In *Harris* v. *Eskridge*, 124 W. Va. 283, 20 S. E. 2d 465, we held: "The personal estate of a decedent is the primary fund out of which debts of all classes and cost of administering his estate should be paid; * * *." In the body of the opinion, it is stated: "It is, of course, settled law in this State that personal property is the primary fund for the payment of

debts.", citing *Boggs v. McCoy,* 15 W. Va. 344; *Saddler v. Kennedy, Admr.,* 26 W. Va. 636; *Crawford v. Turner,* 58 W. Va. 600, 52 S. E. 716, 112 Am. St. Rep. 1014; *American Bank & Trust Co. v. Douglas,* 75 W. Va. 207, 83 S. E. 920; *George v. Brown,* 84 W. Va. 359, 99 S. E. 509. Code, 44-2-21, provides the order in which debts of decedents shall be paid, and Section 22 of the same Article provides that when the assets of a decedent are not sufficient to pay all of the debts, the creditors of each class shall be paid ratably. There is not, in our statute, nor in our judicial system, any authority for the proposition that a preference may exist as between creditors of a decedent in any particular class. Under our statute, certain indebtedness of a decedent is given preference, such as funeral bills to a certain extent, accounts of physicians and nurses, etc., and to debts due the United States and this State, taxes, and amounts due as a fiduciary. Simple indebtedness must be paid ratably and there cannot be any preference permitted. There is a plain showing in the record before us of other indebtedness of the Watson estate, entitling them, if and when they establish their claims, to a share in the distribution of the proceeds of the sale of the 38,000 certificates, making it plain to us that any decree as to the sale and distribution of such certificates in advance of a determination of all of the indebtedness of Watson to his creditors would be premature.

To sum up the whole matter, we are of the opinion that, on the record before us, Koontz should be permitted to pay the full indebtedness of Watson to Elk Horn, at the date of his death, with interest to the date of any decree which may be entered in these causes, and with such costs as may be decreed to be properly chargeable against Koontz, and that when such payments are made, the 60,000 certificates should be released to Koontz in so far as any claim of Elk Horn thereto may be involved. We think the causes should be remanded to the Circuit Court of Ohio County, and that the rights of the creditors of Watson, other than Elk Horn, and the rights of Elk Horn, as a common creditor of the Watson estate in the 38,000

certificates, should be determined and decreed. Such a decree should be entered as will afford all of such common creditors, who establish their claims, equality in the distribution of the proceeds of the sale of the said 38,000 certificates, it being assumed that in the circumstances of these causes it will be necessary to make such sale. Proper provision should be made for the refund to Koontz of the amount paid by him for the 38,000 certificates, and the decree entered in the causes as to such certificates should be based entirely upon the rights of the Watson creditors, including Elk Horn, to be paid ratably out of the assets of his estate.

The decree of the Circuit Court of Ohio County, entered in these causes on July 6, 1950, is reversed, and said causes are remanded to said court for further proceeding, not inconsistent with the holdings of this Court herein. Costs on this appeal will be awarded to the appellants.

*Reversed and remanded.*

## ON PETITIONS FOR REHEARING

A reading of the petitions for rehearing, and the briefs filed in support thereof, brings the Court to the view that while certain questions, assumed to be decided in our decision filed herein on June 5, 1951, should be reserved until a hearing and decision thereof by the Circuit Court of Ohio County, on the remand heretofore ordered, that purpose can be effected without the delay attendant upon the granting of a rehearing and reargument of the questions raised in advance of a hearing thereon in the court below. Therefore, each of the petitions for rehearing filed herein, as well as each of the motions of Harry W. Allers and others, also filed, is denied; but an order will be entered which will recognize, as a part of our decision herein, certain modifications of our original opinion in respect to the questions which we now think should be reserved for future decision by the circuit court on remand, and by this Court should the case again be presented to us.

These cases have been twice before this Court. The first opinion in the cases, prepared by Judge Lovins, was filed on February 14, 1950. In that opinion certain fundamental questions were decided, based upon the record as it then stood, and in which the only parties involved were Elk Horn and stockholders, on the one side, and Koontz on the other. Certain sales of certificates theretofore made to Koontz were set aside, in so far as they operated to the prejudice of Elk Horn. The case was remanded to the Circuit Court of Ohio County for the entry of a proper decree. Following this action, certain creditors of C. W. Watson, other than Elk Horn, filed petitions in these causes in said Circuit Court, claiming certain rights in respect to all of said certificates so sold to Koontz, by reason of their status as common creditors of C. W. Watson. These petitions were permitted to be filed, and the persons affected thereby, and made parties thereto, including Koontz and Elk Horn, appeared to the petitions and interposed demurrers raising questions of law in respect to their right to file said petitions, which questions were not passed upon by the trial court. On the contrary, without passing upon any of these questions, the trial court entered a final decree ordering the sale of all of the certificates purchased by Koontz, and giving Elk Horn a first lien on the proceeds of such sale, to the extent necessary to pay its debt in full. From that decree the appeal now before the Court resulted.

A strange situation exists. For the first time all the original parties to this litigation are in agreement upon two points; one, that this Court, in its opinion filed June 5, 1951, has departed fundamentally from the decision of February 14, 1950; and second, that Elk Horn is entitled to preference in the payment of the proceeds of any sale of the 38,000 certificates not covered by any collateral agreement; but as to which Elk Horn was a common creditor of C. W. Watson. This Court is not conscious of having departed, in its decision of June 5, 1951, from the fundamentals of the first decision in the case. In that first decision it held that the sales were void only in so far as

they prejudiced the rights of Elk Horn. That fundamental ruling has not been departed from in any way; but the injection into the case of the new element of creditors, other than Elk Horn, appearing in the case, and being permitted to file petitions setting up claims against the certificates purchased by Koontz, and the appearance thereto by Koontz and Elk Horn, certainly requires this Court, and should have prompted the lower court, to take some notice of the fact that these creditors were allegedly in existence, and to hold that they are entitled to their day in court. When our decision is studied, it will be found that we have done nothing more than require, as a preliminary to any final disposal of the 38,000 certificates, that the claims of these common creditors, other than Elk Horn, be passed upon. We have never, at any time, recognized the validity of these claims, or even recognized that they are such claims as can be asserted against the 98,000 certificates involved in this litigation, or any of them; and we have plainly indicated that the validity of these claims, as against such certificates, may depend upon whether or not a state of facts is established which would show some relationship between Koontz and the estate of Watson, or its creditors, as would bar Koontz from becoming a purchaser. We have only gone to the extent of holding that these creditors are entitled to an opportunity to present such facts and circumstances as they possess, and to have their day in court. We have not believed it proper to permit a decree to be entered disposing of the certificates, against which the claim of these common creditors is made, before the determination of who is entitled to share in the benefit of any distribution from the sale or other disposition of such certificates.

The holding that the common creditors who filed their petitions in the court below, claiming a right to share in the proceeds from the sale or other distribution of said certificates, was necessarily confined to the 38,000 shares of certificates not covered by any collateral agreement, because we had held that Koontz was entitled to redeem the 60,000 certificates, so far as Elk Horn was concerned,

upon payment of the indebtedness secured by the collateral agreements under which said certificates were disposed of. We took the position that upon the death of Watson, all said certificates became a part of the Watson estate, subject to existing collateral agreements, and subject to claims of its creditors, and that the status of his creditors could not be changed after his death, and no preference created as between creditors of the same class. We adhere to that view, notwithstanding the fact that a creditor may lose his rights by failure to file a claim within the time prescribed by statute. We, therefore, used certain language in the opinion which indicated that if and when the common creditors of C. W. Watson should be able to establish a claim against any of the certificates, they would be entitled to share ratably with other common creditors in the 38,000 certificates. The question was not raised in the court below or in this Court, but it is now asserted that the fact that 28,000 certificates, of the total 38,000 involved, were acquired by Koontz, at a sale made by a Probate Court of the State of Ohio, and that only creditors who filed their claims in that State are entitled to participate in the sale or other disposition of said certificates. In other words, that Elk Horn, who was the only creditor who filed claims against the Watson estate in the State of Ohio, is entitled to the full proceeds of the sale of 28,000 certificates. We will not, at this time, pass upon this contention; but we are impressed with the view that it is of such importance as to deserve the consideration of the Circuit Court of Ohio County on remand, and that we should not permit our opinion, at this time, to foreclose consideration by that court, or by this Court, of a future determination of that question. We do this for two reasons. First, we are not, at this time, fully advised of the force and effect to be given in this proceeding to the Ohio sale. We give full faith and credit, of course, to the sale made in Ohio, in so far as it passed legal title to Koontz of the certificates involved, and this we have always done. The other reason for reserving the question is that it is a question of priority as between Elk Horn, admittedly a common creditor of Watson, as to said 38,000

certificates, and the other creditors who are now asserting their claims, but who have as yet not established such claims as against said certificates. Logically, the question to be determined first is whether common creditors of Watson, other than Elk Horn, are in position to assert any claim against any of the certificates purchased by Koontz. If it be held that they are not in position to assert such claim, by reason of the sale to Koontz, and our holdings on the effect of such sales, then no question of priority will be raised. That question can only arise when it is established, if it ever is, that these common creditors, other than Elk Horn, are entitled to participate, to any degree whatever, in any of the certificates involved.

Being of the opinion that all questions of priority as to the 38,000 shares, as between the common creditors of C. W. Watson, other than Elk Horn, who may be able to establish their claims, should be reserved, and that the same should be treated as one proper to be considered by the Circuit Court of Ohio County on remand, any language in our original opinion which might be construed as foreclosing that question is hereby withdrawn, and to that extent our original opinion is modified and corrected. We are constrained to handle the case in this fashion because the granting of a rehearing would have no other effect than to permit us to modify our opinion to this effect; and the action we take will serve to avoid the delay the granting of a rehearing would entail.